## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Donald CURRIER, Brett Currier, Melissa Currier, Terri Currier, Amber Lawrence, Mikel Cardinal, Maylee Cardinal, Denise Frickey, Christina Aragon, Ha-Nul Lee, Daryll Tinson, Mary Suttles, Derrick Lee Tinson, Gerald Tinson, Daniel LeWillis Tinson, Jason Ludovico, Broderick J. Mosley, Mary Mosley, Willie Smith, Autumn Mosley, Broshayla Mosley, Derrian Hamilton, Patricia Latimer, Adam Henson, Amanda Masarskiy, Brian Edington, Vicki Edington, Marsha Herd, Raymond Herd, Derek Fox, Marc Shelton, Yukiko Shelton, Linda Penn, Aiko Shelton, Tawn-Kai Shelton, Ryan Majewski, Karen Majewski, Samantha Carney, Andrew Kenyon, Cuong Le, Adam Krouse, Raeshaundra Krouse, Isabella Krouse, Bryce Krouse, Alexander Murphy, Lee Murphy, Maddison Murphy, Aaron Murphy, Phillip F. Yerou, Nathan Gray, Anthony Manalo, Ryan Payne, Nigel Max Edge f/k/a Sean Debevoise, Adam Tuculet, Jorge Manuel Ramirez, Dionia Ramirez, Dammon J. Sharp, Kathy Kleinik, Andrew Sharp, Gabriel Kuhlman, Richard Ian Kuhlman, Anthony W. Johnson, Patricia Johnson, Lindsey Johnson, Jesse A. Sage, Dawn Sage, Ted Sage, Molly Sage, Rebekkah Sage Miller, Rachel Sage Miller, Jonathan Sage, Benjamin Sage, Jacob Sage, Jesse Teeples, Robert Doss, Christopher Rodriguez, Thomas Graham, Jacquelin Hammell, <br><br> *Plaintiffs*, <br><br> v. <br><br> The Islamic Republic of Iran <br><br> *Defendant*. | Civil Action No. _____ |

## **COMPLAINT**

For cause of action, Plaintiffs show the Court as follows:

1

## I.  PARTIES & NATURE OF THE ACTION

**1.1**     Plaintiffs are United States nationals who seek judgement against Defendant, the Islamic Republic of Iran ("Iran"), pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1601–1611.

**1.2**     Specifically, this is a civil action pursuant to the FSIA's terrorism exception, 28 U.S.C. § 1605A, for wrongful death, personal injury, and related torts, brought by estates and families of United States nationals and/or members of the U.S. armed forces (as defined in 10 U.S.C. § 101) who were killed or injured by Defendant and/or its agents in Iraq from 2003 to 2011 (the "Relevant Period").

**1.3**     At issue in this case are approximately thirty (30) acts of extrajudicial killing that occurred in Iraq from approximately 2003 to 2011 (collectively the "Terrorist Attacks").  The Terrorist Attacks were committed by terrorist militia groups.  These groups attacked U.S. Armed Forces members and U.S. Government contractors stationed in Iraq during Operation Iraqi Freedom and caused an extrajudicial killing, as defined by 28 U.S.C § 1605A(a)(1), in each attack.

**1.4**     As detailed in Part III below, upon information and belief, Iran provided material support and resources to the enemy forces who planned and/or orchestrated the Terrorist Attacks. Accordingly, Plaintiffs file suit against Defendant Iran as a state sponsor of terrorism under 28 U.S.C. § 1605A(c).

**1.5**     Five (5) of the named Plaintiffs (hereinafter the "KIA Family-Plaintiffs") are immediate family members of U.S. Armed Forces members and U.S. Government contractors who were tragically killed in action (KIA) during Operation Iraqi Freedom.  Specifically, these fallen service members were the victims of extrajudicial killings involving Improvised Explosive

2

Devices ("IEDs") or Explosively Formed Penetrators ("EFPs"), the more technologically advanced and deadly version of an IED. *See Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 26-27 (D.D.C. 2019).

1.6     The remaining Plaintiffs (hereinafter the "Surviving-Plaintiffs") are twenty-seven (27) former U.S. Armed Forces members and former U.S. Government contractors, and forty-six (46) members of their immediate families. The former Armed Forces members and contractors were also stationed in Iraq from approximately 2003 to 2011. They suffered various personal injuries following numerous acts of extrajudicial killing. Most of these terrorist attacks involved IEDs, including the more deadly EFP. Other attacks involved Rockets, Mortars, and Rocket Propelled Grenades ("RPGs").

1.7     Defendant Iran is a foreign state under 28 U.S.C. §§ 1603(a) and 1605A.

## II.     STANDING, JURISDICTION, AND VENUE

2.1     Plaintiffs are all United States citizens and have standing to bring this FSIA action under 28 U.S.C. § 1605A(a)(2)(A)(ii)(I). *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 112–113 (D.D.C. 2015) (Contreras, J.).

2.2     Plaintiffs seek money damages for death and personal injuries caused by Iran's provision of significant material support and resources to enemy forces operating in Iraq. Specifically, Iran provided material support to enemy forces who planned and/or orchestrated terrorist attacks aimed against active U.S. service members and U.S. Government contractors stationed in Iraq from approximately 2003 to 2011 during Operating Iraqi Freedom.

2.3     This support allowed such enemy forces to successfully execute acts of extrajudicial killing. Thus, pursuant to the FSIA, 28 U.S.C. § 1605A, and related statutes— including the Torture Victims Protection Act of 1991, Pub. L. No. 102–256, § 3(a), 106 Stat.

73,73 (1992); 28 U.S.C. § 1605A(h)(7); and 28 U.S.C. § 1605A(h)(3) (citing 18 U.S.C. § 2339A(b)(1))—Defendant Iran is subject to suit in the courts of the United States. So, this Court may assert jurisdiction over the subject matter of this Complaint. *See Flanagan,* 87 F. Supp. 3d at 113.

2.4     Lastly, since January 19, 1984, the United States has designated Defendant Iran as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)), Section 40 of the Arms Export Control Act (22 U.S.C. § 2870), and Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371). *See State Sponsors of Terrorism*, U.S. DEP'T OF STATE, https://www.state.gov/state-sponsors-of-terrorism/ [https://perma.cc/WCS2-9L9T] (last visited March 17, 2025).

2.5     Iran was designated a state sponsor of terrorism at the time of the Terrorist Attacks that form the basis of this lawsuit and at the time this FSIA Amended Complaint was filed. Therefore, the Court must exercise its subject matter jurisdiction and hear this claim under 28 U.S.C. § 1605A(a)(2)(A)(i)(I). *See Doe v. Democratic People's Republic of Korea Ministry of Foreign Affairs Jungsong-Dong*, 414 F. Supp. 3d 109, 123 (D.D.C. 2019) (concluding that when an FSIA Plaintiff satisfies § 1605A(a)(2), "[n]ot only does the Court have subject matter jurisdiction, it must exercise that jurisdiction").

2.6     The Court may exercise personal jurisdiction over Iran upon sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned. 28 U.S.C. § 1608(a)(3); *Republic of Sudan v. Harrison*, 587 U.S.

1, 5 (2019).  Defendant Iran may therefore be properly served under the FSIA at the offices of

its head of the ministry of foreign affairs:

**The Islamic Republic of Iran**
The Ministry of Foreign Affairs
Attn: Seyyed Abbas Araghchi
Khomeini Avenue
United Nations Street
Tehran, Iran

**2.7**     In the alternative, if service cannot be made within 30 days under 28 U.S.C.

§ 1608(a)(3), service may be perfected by diplomatic service under 28 U.S.C. § 1608(a)(4).

*Estate of Hirshfeld v. Islamic Republic of Iran*, 235 F. Supp. 3d 45, 46 (D.D.C. 2017) (Kollar-

Kotelly, J.).

**2.8**     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4).

## III.     FACTUAL ALLEGATIONS

**3.1**     Upon information and belief, the Islamic Republic of Iran has strategically

ignored all FSIA lawsuits filed and served against Defendant since the enactment of 28 U.S.C.

§ 1605A.  *See Flanagan*, 87 F. Supp. 3d at 120 (noting that Ali Akbar Hashemi Rafsanjani,

the former Iranian President, "complained at length about the [FSIA] suits" and was especially

concerned about punitive damage awards).  Because of Iran's choice to disregard United States

law and civil procedure, Plaintiffs are practically unable to seek responsive discovery from

Defendant.  Therefore, like other FSIA litigants, Plaintiffs must rely on expert testimony to

demonstrate Iran's provision of material support or resources to enemy forces in Iraq who

planned and executed the Terrorist Attacks.[1]

---

[1] *See, e.g.*, *Karcher*, 396 F. Supp. 3d at 25 (citing expert testimony that "identification of the weapon as an
EFP *all but* necessitates the inference that Iran was responsible.").

5

**3.2**    The majority of facts plead in Section III.A through Section III.G below were previously published in an Expert Report written by Dr. Matthew Levitt and tendered to the court in *Hake v. Bank Markazi Jomhouri Islami Iran*, Case No. 1:17-cv-114-TJK, Dkt. 94 (D.D.C. 2020) (Kelly, J.) and *Karcher v. Islamic Republic of Iran*, Case No. 1:16-cv-232-CKK (Kollar-Kotelly, J.) ("Levitt Report").  Plaintiffs have retained Dr. Levitt, a former U.S. counter-terrorism analyst and noted expert in Middle Eastern terrorism, and other experts who will provide similar evidence and testimony in this action.

**3.3**    As discussed in more detail below, the acts of international terrorism[2] at issue in this Action (the "Terrorist Attacks") were perpetrated by agents of Iran who were materially (and substantially) supported, directly and/or indirectly, by Defendant.

**3.4**    Defendant Iran's agents included Hezbollah, a U.S.-designated Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"));[3] the Islamic Revolutionary Guard Corps ("IRGC"), whose subdivision the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF") is a U.S.-designated Specially Designated Global Terrorist ("SDGT"); Iran's Ministry of Intelligence and Security ("MOIS") (an SDGT and Specially Designated National,

---

[2] As used herein, the term "international terrorism" shall have the same meaning as set forth at 18 U.S.C. § 2331(1), which defines international terrorism as "activities that (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the person they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

[3] The pronunciation and spelling of "Hezbollah" (also known as "Hizbollah" and "Hizbu'llah") vary by region and dialect, but all variants translate to the "Party of Allah."  As used herein, Hezbollah and Hizbollah refer to a Shiite Muslim political party.

"SDN"); and other terrorist agents that included a litany of Iraqi Shia terror groups referred to herein collectively as "Special Groups."[4]

    **3.5**    The Special Groups and FTOs that Iran provides material resources and support to include multiple Shia, and some Sunni, terror groups in Iraq, including Kata'ib Hizballah ("KH"); Asa'ib Ahl Al Haq ("AAH"); Jaysch al Mahdi ("JAM"); Badr Organization ("Badr") (all discussed below); and Ansar al Islam and Al Qaida in Iraq

    **3.6**    Iran also conspired with and materially supported Sunni FTOs Ansar al Islam ("AAI") and Al Qaida ("AQ") to terrorize the people of Iraq and Coalition Forces, seeking to disrupt the peacekeeping process and prevent the establishment of a free and democratic Iraq.[5]

    **3.7**    Tellingly, some of those organizations, such as Hamas, Hezbollah, and the Palestinian Islamic Jihad, maintain representative offices in Tehran, in part to help coordinate Iranian financing and training.[6]

    **3.8**    The Terrorist Attacks resulted in deaths, maiming, and/or other injuries to Plaintiffs and/or Plaintiffs' family members

    **3.9**    None of the Terrorist Attacks occurred in the course of (A) declared war; (B) armed conflict, whether or not war had been declared, between two or more nations; or (C) armed conflict between military forces of any origin.

---

[4] As discussed in more detail below, Special Groups are terrorist organizations established and funded by Iran.

[5] The U.S. Department of State designated Al Qa'ida, Ansar al Islam, and Al-Qa'ida in Iraq ("AQI") as Foreign Terrorist Organizations on October 8, 1999, March 22, 2004, and December 17, 2004, respectively.

[6] U.S. DEP'T OF STATE, *2016 International Narcotics Control Strategy Report*, https://2009-2017.state.gov/j/inl/rls/nrcrpt/2016/ [https://perma.cc/3JBL-83SB] (last visited March 20, 2025).

**3.10**    Iran serves as a command, financial and/or logistical conduit for various terrorist groups, including the Terrorist Groups and FTOs named herein, and their terrorist activities, specifically including the Terrorist Attacks that killed or injured Plaintiffs or Plaintiffs' family members.  Defendant knew it was supporting terrorists and FTOs.

**3.11**    As detailed below, Iran directed millions of U.S. dollars in arms, equipment, and material to Hezbollah, the IRGC, and the IRGC-QF, which, in turn, trained, armed, supplied, and funded Iran's terrorist agents in Iraq in carrying out their attacks against Plaintiffs and their family members.

**3.12**    At all relevant times, Defendant intentionally, knowingly and/or recklessly provided material support, directly or indirectly, to the Special Groups, Ansar al Islam, Al Qaida  and other terrorist organizations that, at all relevant times, engaged in acts of international terrorism against the United States and U.S. nationals, including Plaintiffs.

**3.13**    At all relevant times, Defendant intentionally, knowingly and/or recklessly contributed substantial and material support and/or resources, directly and/or indirectly, to persons and/or organizations engaged in the commission of acts of terrorism that threatened the security of U.S. nationals.

**3.14**    Iran directed, planned, and authorized acts of torture, extrajudicial killing, and hostage taking.  And Iran provided material support or resources to Hezbollah, Special Groups, Ansar al Islam, Al Qaida, and other terrorist organizations that perpetrated the Terrorist Attacks specifically for the purpose of carrying out those Attacks.  Iran's actions proximately and directly caused the murders and injuries to Plaintiffs and their family members in those Terrorist Attacks.

**3.15**    Plaintiffs' deaths and injuries were a natural and probable consequence of Iran's actions as set forth herein.  Moreover, such deaths and injuries should have been, and in fact, were foreseeable.

**3.16**    At all times relevant to this Complaint, Iran has been a foreign state within the meaning of 28 U.S.C. § 1603 and has been designated as a State Sponsor of Terrorism pursuant to § 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405.

**3.17**    Iran provided material support and resources for the commission of acts of extrajudicial killing, torture, and/or hostage taking within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attacks in which Plaintiffs were killed, injured, or maimed.  And Iran performed actions that caused the Terrorist Attacks and the harm to Plaintiffs herein.

## A.    Iran's Interest in Iraq

**3.18**    "In the wake of the Iran-Iraq War (1980-1988), Tehran remained concerned about threats closest to home.  The first four regional commands of the Islamic Republic Revolutionary Guard Corps, ("IRGC")[7]—Iran's chief terrorist apparatus—were therefore dedicated to Iraq (First Corps), Pakistan and Iran's border provinces (Second Corps), Turkey and Kurdish groups (Third Corps), and Afghanistan and Central Asia (Fourth Corps). According to seized Iraqi intelligence, by the early 1990s Iran had built the Badr Corps, discussed further below, into a fully functional militia backed by the Islamic Revolutionary

---

[7] The U.S. Government designated the IRGC as a Global Terrorist Organization in October 2017.  *See Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority,* U.S. DEP'. OF THE TREASURY (Oct. 13, 2017), ,

https://home.treasury.gov/news/press-releases/sm0177 [https://perma.cc/G822-4SDN] (last visited March 17, 2025).

Guard Corps-Qods Force ("IRGC-QF")[8]—the IRGC's external wing—regional command in Iraq, better known as Ramazan Corps (Headquarters)."  Levitt Report.

3.19     "By forcing the collapse of Saddam Hussein's regime, Operation Iraqi Freedom removed Iran's greatest enemy and longtime nemesis.  *The 2003 invasion therefore provided Iran with a historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region*.  To that end Iran employed an 'all elements of national power' approach in exploiting the outcome of this seminal event.  This included both soft and hard power, from the use of political, economic, religious, and cultural leverage to the support of militant proxies."  Levitt Report (emphasis added).

3.20     "In pursuing its goals in Iraq, Iran backed multiple, often opposing parties and movements in an effort to secure its interests no matter the outcome of the country's political developments.  By hedging its bets, Iran was able to rely on different groups for different types of activities.  For example, SCIRI and the Badr Organization quickly entered the political fray in Iraq, while other hard-line groups played a more strictly militant function."  Levitt Report

3.21     "Understanding Iran's layered relationships with its Iraqi proxies is critical to understanding the role Hezbollah[9] came to play in Iraq.  Working through its longtime proxies, Iran set out to achieve several goals in Iraq, the most important and overarching of which was the creation, in the words of then-Defense Intelligence Agency director Lowell Jacoby, of a '*weakened, decentralized and Shi'a-dominated Iraq that is incapable of posing a threat to*

---

[8] The U.S. Government designated the IRGC-QF as a Terrorist Financier in October 2007. *See Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, U.S. DEP'. OF STATE (Oct. 25, 2007), , https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm [https://perma.cc/V6BE-DJMM] (last visited March 17, 2025).

[9] Hezbollah is also spelled "Hizballah."  Both names refer to the same terrorist organization.

*Iran.*'[10]   In addition, the long-held Iranian desire to push the United States out of the Gulf region now extended to the large U.S. and international military presence in Afghanistan to Iran's east and Iraq to its west.  Iran sought to foster unity among Iraq's various Shia parties and movements so that they could consolidate Shia political control (Shia constitute about 60 percent of the country's population) over the new Iraqi government."  Levitt Report (emphasis added).

     **3.22**    "Even as it pursued its political goal of seeking a weak federal state, dominated by Shia allies and vulnerable to Iranian influence, Tehran also sought to bloody coalition forces in Iraq.  Careful not to provoke a direct confrontation with U.S. and coalition forces, Iran armed, trained, and funded a variety of Shia militias and insurgent groups in an effort to bog down coalition forces in an asymmetric war of attrition.  *If the United States were humiliated in Iraq and forced out of the region in disgrace, the thinking went, the Americans would be deterred from pursuing similar military interventions in the region in the future.*"  Levitt Report (emphasis added).

     **3.23**    "Iran's plans to influence political developments in Iraq, as it happened, long predated the U.S. invasion of 2003.  This meant the Iranians were ready to fill the security vacuum immediately following the invasion, when, a U.S. embassy cable later noted, 'little attention was focused on Iran.'[11]"  Levitt Report.

---

[10] *Current and Projected National Security Threats to the United States: Hearing Before the Select Committee on Intelligence,* 109th Cong., 1st Sess., (Feb. 16, 2005) (statement of Vice Adm. Lowell E. Jacoby) (emphasis added).

[11] Sam Dagher, *In Iraq, a Very Busy Iran*, WALL ST. J. (Nov. 29 2010, 12:01am), https://www.wsj.com/articles/SB10001424052748703994904575646911886138950 (last visited March 17, 2025).

3.24    "In April 2008, General David Petraeus and Ambassador Ryan Crocker, the most senior U.S. military commander and diplomat in Iraq, respectively, testified before the Senate Armed Services Committee.  In his testimony, *General Petraeus highlighted the flow of sophisticated Iranian arms to Shia militants in Iraq*.  The military's understanding of Iran's support for such groups crystallized, Petraeus explained, with the capture of a number of prominent Shia militants and several members of the IRGC-QF operating in Iraq as well." Levitt Report (emphasis added).

3.25    "Ambassador Crocker, himself a former U.S. ambassador to Lebanon, was undiplomatically blunt in assessing the implications of Iran's arming and training of extremist militia groups: 'What this tells me is that Iran is pursuing, as it were, a Lebanonization strategy, using the same techniques they used in Lebanon, to co-opt elements of the local Shia community and use them as basically instruments of Iranian force.'[12]" Levitt Report.

**B.    Hezbollah's Founding, Ideology, and Structure**

3.26    "Founded in the early 1980s by a group of young Shia militants, Lebanese Hezbollah (the 'Party of God') was the product of an Iranian effort to aggregate under one roof a variety of militant Shia groups in Lebanon, themselves the products of the domestic and regional instability of the time.  Hezbollah was the outgrowth of the complex and bloody civil war.  For the first time, Lebanon's historically marginalized Shia Muslims attempted to assert economic and political power.  Until 1982, the Shia of Lebanon were considered backward and simple by their more cosmopolitan Christian and Sunni cousins."  Levitt Report.

---

[12] *The Situation in Iraq and Progress by the Government of Iraq in Meeting Benchmarks and Achieving Reconciliation: Hearing before the Committee on Armed Services*, 110th Cong., 2d Sess., (Apr. 8–10, 2008) (Statements of Gen. David H. Petraeus and Ambassador Ryan Crocker).

3.27     "Iran played a central role in Hezbollah's founding.  In 1987, the CIA assessed that 'an Islamic fundamentalist movement probably would have developed in Lebanon without outside support, but Iranian aid has been a major stimulant.'[13]   Shortly after the Israeli invasion, approximately 1,500 IRGC advisors set up a base in the Bekaa Valley with the goal of exporting the Islamic revolution to the Arab world.[14]   Naim Qassem recalls how training camps supervised by the IRGC were set up in the Bekaa Valley as early as 1982 and how all members were required to attend these camps and learn how to confront the 'enemy.'[15]"  Levitt Report.

3.28     "In 1985, Hezbollah identified the organization's ideological platform: 'We view the Iranian regime as the vanguard and new nucleus of the leading Islamic State in the world.  We abide by the orders of one single wise and just leadership, represented by 'Waliyat el Faqih' [rule of jurisprudent] and personified by [Iranian Supreme Leader Ayatollah Ruhollah Musawi] Khomeini.'[16]  Hezbollah has been Iran's proxy ever since, and it is estimated that Iran provides Hezbollah with as much as $700 million—$l billion per year.[17]"  Levitt Report.

---

[13] *Lebanon: The Prospects for Islamic Fundamentalism*, Directorate of Intelligence, CENT. INTEL. AGENCY (May 6, 1987), https://www.cia.gov/readingroom/docs/DOC_0000138966.pdf/ (last visited March 17, 2025).

[14] DANIEL BYMAN, DEADLY CONNECTIONS: STATES THAT SPONSOR TERRORISM 82 (2005).

[15] NAIM QASSEM, HIZBULLAH: THE STORY FROM WITHIN 98 (2005).

[16] *Hezbollah's Global Reach: Joint Hearing Before the Subcomm. On Int'l. Terrorism and Nonproliferation and the Subcomm. on the Middle East and Central Asia,* 109th Cong., 2nd Sess. (Sep. 28, 2006) (statement of Ilan Berman, Vice President for Policy, Am. Foreign Policy Council).

[17] Dan Williams, *Top Israeli general sees increased Iran spending on foreign wars,* REUTERS (Jan. 2, 2018. 5:01 AM), https://www.reuters.com/article/us-iran-rallies-israel/top-israeli-general-sees-increased-iran-spending-on-foreign-wars-idUSKBN1ER0Q9 (last visited March 17, 2025).

3.29    "According to the CIA, in the first few years following its founding, Hezbollah 'established what is virtually a radical Islamic canton in the Bekaa Valley, despite Syria's military presence there.'[18]  In areas under its control, the CIA reported in 1987, strict Islamic rule was put in place.  'Sale or transport of liquor are prohibited, women are forbidden from interacting with men in public and must adhere to a strict dress code, civil crimes are punished according to the Koran, and Western education and influences are prohibited.'[19]"  Levitt Report.

3.30    "It was also clear from the start that Hezbollah would be a force to be reckoned with.  Over a nine-month period in 1985, the CIA calculated, Iran's Lebanese proxy groups, including Hezbollah, were responsible for at least 24 international terrorist incidents, eight of which targeted French and American targets.[20]  As Iran sought to dissuade countries from arming and supporting Iraq in the ongoing and costly Iran-Iraq war (1980–1988), American and French targets were popular targets for Hezbollah and other Iranian surrogate groups. Heeding Iran's call to perpetrate attacks beyond Lebanon's borders, Hezbollah found itself involved in plots throughout the Middle East." Levitt Report.

3.31    For example, in Lebanon, "three spectacular attacks targeting U.S. interests executed over an 18-month period came to define the tenor of Hezbollah's relationship with the United States for years to come.  On April 18, 1983, a suicide bombing at the U.S. Embassy in Beirut killed 63, including 17 Americans.  Six months later, on October 23, two separate

---

[18] *Lebanon: The Prospects for Islamic Fundamentalism*, *supra* note 13, at 6.

[19] *Id*.

[20] *Terrorism Review*, Directorate of Intelligence, CENT. INTEL. AGENCY (Jan. 13, 1986), https://www.cia.gov/readingroom/search/site/January%2013%2C%201986 (last visited March 17, 2025).

suicide attacks targeted the U.S. Marine and French army barracks, both compounds under the aegis of the Beirut-based Multinational Force sent to Lebanon as peace-keepers to oversee the evacuation of the Palestine Liberation Organization (PLO) from Beirut.[21]  Those attacks, which left 241 Americans and 58 French dead, were followed less than a year later by the September 20, 1984, bombing of the U.S. embassy annex, killing 24."  Levitt Report.

3.32    "The U.S. government had little doubt about who was behind the attack, even before crime scene analysis and sensitive source reporting began to flow in.  Writing just days after the second embassy bombing, the CIA noted that 'an overwhelming body of circumstantial evidence points to the [Hezbollah], operating with Iranian support under the cover name of Islamic Jihad.'[22]  For instance, the CIA added that 'Shia fundamentalists are the only organized terrorists in Lebanon likely to willingly sacrifice their lives in such an attack.'[23]"  Levitt Report.

3.33    "Since its founding, Hezbollah has developed a sophisticated organizational and leadership structure which commands its civilian, political, social, military and terrorist functions.  The overall governing authority, the Majlis al-Shura (Consultative Council), wields all decision-making power and directs several subordinate functional councils.  Each functional council oversees the normal operations of key areas and reports directly to the Shura Council which, according to Hezbollah Deputy Secretary General Qassem, is 'in charge of

---

[21] HALA JABER, HEZBOLLAH: BORN WITH A VENGEANCE 77 (1997).

[22] *Lebanon: The Hizb Allah*, Directorate of Intelligence, CENT. INTEL. AGENCY (Sept. 27, 1984), https://www.cia.gov/readingroom/docs/CIA-RDP85T00287R001302140001-2.pdf  (last visited March 17, 2025).

[23] *Lebanon: The Hizb Allah*, *supra* note 22.

drawing the overall vision and policies, overseeing the general strategies for the Party's function, and taking political decisions.'[24]" Levitt Report.

3.34    "U.S. assessments echo Qassem's description: 'Hezbollah has a unified leadership structure that oversees the organization's complementary, partially compartmentalized elements.'"[25] For instance, in October 2020, the United States Treasury's Office of Foreign Assets Controls sanctioned two members of Hizballah's Central Council. According to Treasury Secretary Steven Mnuchin, 'Hizballah's senior leaders are responsible for creating and implementing the terrorist organization's destabilizing and violent agenda against U.S. interests and those of our partners around the world[.]'[26]" Levitt Report.

3.35    The U.S. intelligence community ultimately sees Hezbollah as "a multifaceted, disciplined organization that combines political, social, paramilitary, and terrorist elements" in which decisions "to resort to arms or terrorist tactics is carefully calibrated."[27] U.S. officials have also "long acknowledged the capabilities of Hezbollah's terrorist network, not only for the attacks it has carried out abroad targeting U.S. interests such as the bombings of the U.S. marine barracks and embassy in Lebanon in the 1980s and the bombing of the Khobar Towers

---

[24] NAIM QASSEM, HIZBULLAH: THE STORY FROM WITHIN 64 (2005).

[25] CASEY L. ADDIS & CHRISTOPHER M. BLANCHARD, CONG. RSCH SERV., R41446, HEZBOLLAH: BACKGROUND AND ISSUES FOR CONGRESS (2011).

[26] Press Release, *Treasury Targets Hank-Ranking Hizballah Officials*, U.S. DEP'T OF THE TREASURY (Oct. 22, 2020), *available at* https://home.treasury.gov/news/press-releases/sm1161 (last visited March 17, 2025).

[27] *Annual Threat Assessment of the Intelligence Community: Testimony Before the Senate Select Comm. on Intelligence* 111th Cong., 1st Sess., (Feb. 12, 2009) (testimony of Dennis C. Blair, Director of National Intelligence).

in Saudi Arabia in 1996, but also because of Hezbollah's active presence in the United States.[28]" Levitt Report.

## C.     Hezbollah's Role as an Iranian Proxy in Iraq

3.36     "Hezbollah's activities in Iraq since the 2003 U.S. invasion are a function of the group's close alliance with Iran in general and the IRGC-QF in particular.  Iran's strategy in Iraq—and Hezbollah's role in that strategy as Iran's primary militant proxy group—is a logical extension of Iran's covert activities in Iraq and the region throughout the 1980s and 1990s."  Levitt Report.

3.37     "Throughout the Iran-Iraq War (1980–1988), Iraq was a primary target of Iranian-sponsored terrorist groups.  To this end, the CIA noted in 1986, 'Iran trains and finances several Iraqi dissident groups, such as the Dawa Party, that are dedicated to overthrowing President Saddam Husayn.'[29]  Iranian sponsorship of terrorism picked up pace as the Iran-Iraq War came to a close and U.S.-Iran tensions increased.  'No longer drained by fighting Iraq,' former White House counterterrorism director Richard Clarke wrote, '[Iranian] aid to Hezbollah increased.'[30]  Iranian support to its proxies in the Gulf increased as well." Levitt Report.

3.38     "Iraqi Shia extremists feature prominently in Iran's arsenal of regional proxies. Some of the most proactive Iraqi Shia extremists to work with Iran in the post-2003 period

---

[28] *See, e.g.*, Press Release, U.S. DEP'T OF THE TREASURY (Sept. 13, 2012) (noting that Hizballah was named a Specifically Designated Terrorist in January 1995).

[29] *State Support for International Terrorism, 1985*, Directorate of Intelligence, CENT. INTEL. AGENCY     (May     1986),     https://www.cia.gov/readingroom/docs/CIA-RDP97R00694R000600100001-3.pdf (last visited March 17, 2025).

[30] RICHARD CLARKE, AGAINST ALL ENEMIES 103 (2004).

began as Iranian proxies some twenty years earlier. Consider, for example, Jamal Jafar Muhammad Ali, better known as Abu Mahdi al-Muhandis, one of the Iraqi Dawa Party terrorists who partnered with Hezbollah to carry out the 1983 embassy bombings in Kuwait and the 1985 assassination attempt on the Kuwaiti emir." Levitt Report.

     **3.39**    "Convicted in absentia for his role in those attacks, Muhandis went on to lead the Badr Corps, the militant wing of the Supreme Council for Islamic Revolution in Iraq (SCIRI). The Badr Corps not only fought alongside Iranian forces in the Iran-Iraq War, it also engaged in acts of sabotage and terrorism targeting the Hussein Regime. As head of the Badr Corps, Muhandis worked directly with the IRGC-QF and other militant Iraqi Shia targeting the Hussein Regime.[31]" Levitt Report.

     **3.40**    "Iraqi Shia militant groups like the Dawa Party and Badr Corps have long histories of cooperation, training, and cross-fertilization with Hezbollah. As noted before, Dawa operatives engaged in joint terrorist operations with Hezbollah. In fact links between Hezbollah and the Dawa Party run deep. The Dawa Party in Lebanon, one of the precursor elements to what became Hezbollah, was imported from Iraq in 1969 by followers of Iraqi cleric Mohammad Baqr al-Sadr." Levitt Report.

**D.**    **Hezbollah's Role as an Iranian Proxy in Iraq and Iran's Support of Hezbollah**

     **3.41**    "Mirroring the creation of Unit 1800, a unit dedicated to supporting Palestinian terrorist groups and targeting Israel, Hezbollah created Unit 3800, a unit dedicated to supporting Iraqi Shia terrorist groups targeting multinational forces in Iraq." Levitt Report.

---

[31] *Shiite Politics in Iraq: Role of the Supreme Council*, INT'L CRISIS GRP. (Nov. 15, 2007), https://www.crisisgroup.org/sites/default/files/70-shiite-politics-in-iraq-the-role-of-the-supreme-council.pdf (last visited March 17, 2025).

Unit 3800, "established by Hezbollah leader Hassan Nasrallah,[32] at Iran's request, trained and advised Iraqi militant groups.  Almost immediately following the U.S. invasion of Iraq, reports emerged indicating Hezbollah operatives were reaching out to re-establish ties to Iraqi Shia groups.  A July 29, 2003 U.S. intelligence report citing Israeli military intelligence stated that Hezbollah 'military activists' were trying to make contact with Muqtada al-Sadr and his Mahdi Army.[33]"  Levitt Report.

      **3.42**    "By late August they had succeeded, according to a report prepared by a U.S. military analyst.[34] Based on information from a source with 'direct access to the reported information,' the report claimed Hezbollah had assembled a team of thirty to forty operatives in Najaf 'in support of Moqtada Sadr's Shia paramilitary group.'  Hezbollah was both recruiting and training new members of the Mahdi Army, the report added.[35]"  Levitt Report.

      **3.43**    "More reports documenting Hezbollah's then-still-small presence followed, including one citing multiple sources that said Hezbollah was 'buying rocket-propelled grenades antitank missiles' and other weapons for the Mahdi Army.'  Hezbollah's relationship with al-Sadr and his militia were not seen as ad hoc ties between individual Hezbollah and Mahdi Army members but as decisions made at the top of the respective organizations.  A U.S. Army report noted that 'reporting also confirms the relationship between ... Sadr and

---

[32] The U.S. listed Nasrallah as a Specially Designated Terrorist in January 1995.  *See* Dept. of the Treasury: List of Specially Designated Terrorists Who Threaten to Disrupt the Middle East Peace Process, Fed. Reg. 60, 5086 (Jan. 25, 1995).

[33] Edward T. Pound & Jennifer Jack, *Special Report: The Iran Connection*, U.S. NEWS & WORLD REP., Nov. 22, 2004.

[34] Pound & Jack, *supra* note 33.

[35] *Id.*

Hassan Nasrallah.' According to unconfirmed information, the report added, a senior adviser to Nasrallah delivered funds to al-Sadr.[36] The connection rings true, given that 'al-Sadr sought to model his organization on Lebanese Hezbollah, combining a political party with an armed militia and an organization providing social services.'[37]" Levitt Report.

3.44    "The American and Israeli intelligence services were not the only ones investigating Iran and Hezbollah's support to Shia militant groups at the time. In fact, one of the most prolific sources was also one of the most controversial: the Mujahedin-e Khalq (MEK), the Iranian exile group deeply and sometimes violently committed to the overthrow of the regime in Tehran. While the MEK has a track record of collecting critical intelligence later proven to be surprisingly accurate, it remained a US-designated terrorist group until September 2012 (it had already been removed from the European Union and British lists).[38]" Levitt Report.

3.45    "The gist of the MEK's reporting on Hezbollah in Iraq would be corroborated by other sources. According to the MEK, some 800 Hezbollah operatives were on the ground in Iraq by January 2004, including assassination teams.[39] According to other MEK reports, nearly 100 Hezbollah members—including both 'agents and clerics'—infiltrated postwar Iraq at Iran's behest. Following its established modus operandi in Lebanon, Hezbollah reportedly

---

[36] Pound & Jack, *supra* note 33.

[37] *Id.*

[38] Jody Warrick, *U.S. Officials to Remove Iranian Group from Terror List, Officials Say*, WASH. POST, Sept. 21, 2012.

[39] Warrick, *supra* note 38.

established charitable organizations in Iraq 'to create a favorable environment for recruiting.'[40] As early as October 2003, Israeli intelligence also warned their American counterparts that according to their information Hezbollah—at Iran's instruction—intended to help set up a 'resistance movement,' likely in the group's own image, that could conduct mass casualty attacks.[41]" Levitt Report.

      **3.46**     "'Hezbollah has moved to establish a presence inside Iraq,' one administration official said, 'but it isn't clear from the intelligence reports what their intent is.'[42] It was clear, however, that they were traveling through Syria and crossing the long and porous Syrian-Iraqi border to gain entry to Iraq. In November 2003, Israel's defense minister, Shaul Mofaz, went public with information that a wide range of insurgents—from Sunnis affiliated with al-Qaeda to Shia tied to Hezbollah—were crossing Syria to fight coalition forces in Iraq.[43] A few months later, American officials came to the same conclusion, noting that the Syrian regime was believed to be knowingly allowing their passage through Syrian territory, supporting an Iranian initiative to inject battle-hardened foreign fighters into Iraq.[44]" Levitt Report.

---

[40] Raymond Tanter, *Iran's Threat to Coalition Forces in Iraq*, WASH. INST. FOR NEAR E POL'Y (Jan. 15, 2004), https://www.washingtoninstitute.org/policy-analysis/irans-threat-coalition-forces-iraq (last visited March 17, 2025).

[41] Pound, *Special Report: The Iran Connection*.

[42] James Risen, *A Regional Inflamed: The Hand of Tehran; Hezbollah, in Iraq, Refrains from Attacks on Americans* (Nov. 24, 2003), N.Y. TIMES, https://www.nytimes.com/2003/11/24/world/region-inflamed-hand-tehran-hezbollah-iraq-refrains-attacks-americans.html (last visited March 17, 2025).

[43] WASH. TIMES, *Israeli warns of terrorist training* (Nov 14. 2003), https://www.washingtontimes.com/news/2003/nov/13/20031113-113910-5865r/ (last visited March 17, 2025).

[44] Nathan Guttman, *U.S. Sources Claim Hezbollah Sending Combatants to Iraq,* HARRETZ (Tel Aviv) (June 20, 2004), https://www.haaretz.com/1.4718584 (last visited March 17, 2025).

3.47    "By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi interior minister Falah al-Naquib announced the arrest of 18 Lebanese Hezbollah members on terrorism charges.  That summer U.S. military officials noted that Abu Mustafa al-Sheibani, the former Badr Corps commander, headed a network of Iraqi Shia insurgents created by the IRGC-QF.[45]"  Levitt Report.

3.48    "In August 2005, a *Time* magazine article reported that Sheibani had been smuggling in a 'new breed' of IEDs across the border into Iraq as early as January 2005.[46] However, based on an Iraqi intelligence report dated July 11, 2001, Sheibani and the Badr Corps may have been using *EFPs in Iraq as early as 2001*.[47]  The report described a shipment of Iranian weapons that were delivered to Badr Corps members in Diyala, Salah al-Din, and Baghdad governorates."  Levitt Report (emphasis added).

3.49    "The weapons included 107mm and 122mm rockets, as well as 'conically shaped bombs filled with TNT, weighing 5-6 kg and using a locally made metal base.'[48]  The description of these bombs were notably similar to the description of the 'new breed' of IEDs that were imported from Iran into Iraq in early 2005.[49]"  Levitt Report.

3.50    "In London, British Prime Minister Tony Blair cited evidence linking Iran and Hezbollah to recent bombings in which British soldiers were killed in Iraq by a new type

---

[45] *Lebanese Hezbollah Members Detained in Iraq: Minister*, AGENCE FRANCE PRESSE (Feb. 9, 2005).

[46] Michael Ware, *Inside Iran's Secret War for Iraq*, TIME, Aug. 15, 2005, *available at* http://content.time.com/time/magazine/article/0,9171,1093747,00.html (last visited March 17, 2025).

[47] *See* U.S. MILITARY ACADEMY, *July 25, 2001 Memorandum from Major 'Ubadah Muhammad Rajab* (English Translation) (July 25, 2001).

[48] *Id.*

[49] Michael Ware, *Inside Iran's Secret War for Iraq*, *supra* note 46.

of explosive device. 'The particular nature of those devices lead us either to Iranian elements or to Hezbollah, because they are similar to the devices used by Hezbollah, that is funded and supported by Iran,' he noted.[50]" Levitt Report.

3.51    "Suddenly, Iran and Hezbollah's training and weapons smuggling programs had become a priority issue for coalition forces. Still, two more years passed before coalition forces learned that sometime in 2005 'senior Lebanese Hezbollah leadership' directed an experienced Hezbollah commander 'to go to Iran and work with the Qods Force to train Iraqi extremists.'[51] Hezbollah was about to accelerate its Unit 3800 mission in Iraq, with deadly consequences." Levitt Report.

3.52    "Until this point Hezbollah's ties were primarily with Muqtada al-Sadr's Mahdi Army, for which Hezbollah provided expertise and training. But the formation of a new Iraqi government in April 2005 brought Iran's Shia allies, SCIRI and the Dawa Party, into key leadership positions. Already in 2004 splits had begun to develop within the Mahdi Army, providing Iran and Hezbollah with a variety of new splinter groups—at this point more akin to neighborhood gangs than full-fledged militias—with which they could partner." Levitt Report.

3.53    "Iran saw in the Mahdi Army splinter groups—later known as the Special Groups—an opportunity to reproduce the successful Hezbollah model from Lebanon, but with

---

[50] Joint News Conference on U.K-Iraq Relations, British Prime Minister Tony Blair and Iraqi President Jalai Talabni, (Oct. 6, 2005), *available at* https://www.c-span.org/video/?189235-1/uk-iraq-relations (last visited March 17, 2025).

[51] Press Conference on Multi-National Forces-Iraq, Maj. Gen. Kevin Bergner and Brig. Gen. Michael Walsh (Oct. 3, 2007); *see also* Press Briefing, Multi-National Force-Iraq (Oct. 3, 2007), *available at* https://www.globalsecurity.org/military/library/news/2007/10/mil-071003-mnfi-b01.htm.

an eye toward the unique political and social realities in Iraq.[52]  Beyond wanting to maintain plausible deniability for attacks in Iraq, Iranian leaders viewed Iraqi Shia groups as a mechanism through which they could influence Iraqi politics without arousing fears among Iraqi Shia and Sunnis alike that Iran, a longtime enemy of Iraq, still held animus and hostile intentions toward the new Iraqi government.  Since direct Iranian support for Shia militants aroused concerns among Iraqis about Iran's long-term intentions, Lebanese (Arab) Hezbollah made an attractive proxy for Iranian support to Shia Iraqi militants.  Some 100 Shia militants traveled to Lebanon in December 2005 for military training.  'They didn't teach us anything about suicide bombings, they showed us real tactics and taught our snipers,' one trainee commented.[53]"  Levitt Report.

3.54    "By 2006, American intelligence sources, as well as information gleaned from interviews with detainees in Iraq, revealed without a doubt that Hezbollah was training members of the Mahdi Army.  A small number of Hezbollah trainers visited Iraq, according to a senior American intelligence official, but large-scale training for 1,000 to 2,000 Mahdi Army fighters took place in Lebanon.  A midlevel Mahdi Army commander corroborated the U.S. intelligence in summer 2006, when he conceded that some 300 Mahdi Army fighters were sent to Lebanon, apparently to fight alongside Hezbollah during the July 2006 war.  'They are the best-trained fighters in the Mahdi Army,' he added.[54]"  Levitt Report.

[52] Michael Knights, *The Evolution of Iran's Special Groups in Iraq,* COMBATING TERRORISM CTR. AT W. POINT (Nov. 2010) *available at* https://ctc.westpoint.edu/the-evolution-of-irans-special-groups-in-iraq/ (last visited March 17, 2025).

[53] Nizar Latif & Phil Sands, *Mehdi Fighters Trained by Hizbollah in Lebannon*, INDEPENDENT, Aug. 20, 2007 (London Newspaper).

[54] Michael R. Gordon & Dexter Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, N.Y. TIMES (Nov. 8, 2006),  https://www.nytimes.com/2006/11/28/world/middleeast/28military.html.

3.55    "The fact that the Iraqi trainees traveled to Lebanon through Syria, U.S. officials added, suggested that at least some Syrian officials were complicit in the training program.  Moreover, Syrian officials reportedly attended meetings together with IRGC-QF chief Qasem Soleimani and Hezbollah's Imad Mughniyeh to coordinate means of turning up the heat on U.S. forces in Iraq.[55]  Several months after Mughniyeh's assassination, a senior Mahdi Army commander in Baghdad—speaking anonymously because of the sensitivity of what he was about to reveal—said that Mughniyeh had, in fact, supervised Hezbollah operations in Iraq.[56]"  Levitt Report

3.56    "In Washington, despite a consensus on the destructive role Iran was playing in Iraq in late 2006, debates still raged within the U.S. intelligence community over whether Hezbollah was really on the ground in Iraq and whether the group was training Iraqi militias in Iran, Lebanon or both.  Testifying before Congress in November 2006, then-CIA director Gen. Michael Hayden stated, 'I'll admit personally that I have come late to this conclusion, but I have all the zeal of a convert as to the ill effect that the Iranians are having on the situation in Iraq.'[57]"  Levitt Report

3.57    "In early 2007, Iran's political allies in the Iraqi government actually issued a diplomatic demarche demanding Tehran scale back its support for the Iraqi Shia militias, which by then were posing a tremendous security risk in the country.  Iraqi officials were being killed in internecine Shia violence, possibly the result of Iran's apparent decision to intensify

---

[55] *Id.*

[56] ASSOCIATED PRESS, *Hezbollah said to have trained militants in Iraq* (July 1, 2008), *available at* https://www.denverpost.com/2008/07/01/hezbollah-said-to-have-trained-militants-in-iraq/ (last visited March 17, 2025).

[57] Gordon & Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, *supra* note 54.

Shia militia activity after Hezbollah's self-declared victory in its war against Israel."  Levitt Report.

3.58     "Speaking in January 2007, Hezbollah chief Hassan Nasrallah told his group's satellite television station, al-Manar, that '*the American occupation poses a danger to the Iraqi people and to the region.*'  He was crystal clear on his means of rectifying the situation: 'We support the option of a comprehensive Iraqi resistance, with all its aspects, especially the military aspect.  We believe that the solution in Iraq begins with adopting the option of armed resistance—jihad against the occupation forces.'[58]"  Levitt Report (emphasis added).

3.59     "In seeking to lead from behind and put an Arab face on its efforts, the Islamic Republic sent a Hezbollah master trainer—Ali Musa Daqduq—to Iran to coordinate the training program and make periodic visits to Iraq.  This use of the Hezbollah leader Daqduq assuaged any Iraqi unease about working under seemingly aloof and disdainful Iranian operatives.[59]  Whereas Daqduq had been informed back in 2005 that he would be traveling to Iran to work with the IRGC- QF to train Iraqi extremists, he only went to Tehran in May 2006, accompanied by the Hezbollah official in charge of Unit 3800 activities in Iraq, Yusef Hashim."  Levitt Report.

3.60     In Tehran, Daqduq met with "the commander and deputy commander of IRGC-QF special external operations, who informed them of plans to monitor and report on progress in Iraq.  In the year before British Special Forces captured Daqduq in Basra in late

---

[58] Niles Lathem, *House of Jihad*, N.Y. POST (Feb. 5, 2007), https://nypost.com/2007/02/05/house-of-jihad/ (last visited March 17, 2025).

[59] Although Iraqi Shia resented and distrusted their Iranian sponsor, Hezbollah Trainers showed the Shias respect and compensated for Iran's shortcomings.  *See* Felter & Fishman, *Iranian Strategy in Iraq*, at 69 (citing U.S. Intelligence Report IR 012).

2007, he made four trips to Iraq.  He reported back to the IRGC-QF on the Special Groups'
use of mortars and rockets, their manufacture and use of improvised explosive devices (IEDs),
and kidnapping operations.  His overall instructions were simple: 'He was tasked to organize
the Special Groups in ways that mirrored how Hezbollah was organized in Lebanon.'[60]" Levitt
Report.

    **3.61**    "The outsourcing of training to Hezbollah spoke volumes for Iran's regard for
the group's professionalism as terrorist trainers.  The use of Hezbollah also averted Iraqi
militants' complaints about the religious indoctrination included in the Iranian training
programs, which were generally uninspiring and taught by sheikhs who did not speak Arabic
well.[61]  Additionally, according to documents seized by coalition forces, a formal selection
process for prospective trainees considered the needs identified by Special Groups leaders but
also set minimal qualifications for admittance.  Candidates had to be able to read and write, for
example, but Special Groups leaders also sought open-minded, strong, mature, and responsible
people who demonstrated acumen for organizational skills and were 'not a problem.'[62]" Levitt
Report.

    **3.62**    "The IRGC-QF and its Hezbollah instructors trained 20 to 60 Iraqis at a time,
in sessions generally lasting 20 days.[63]  Iraqi militants selected to train in Iran traveled to camps

---

[60] Jim Garamone, *Iran, Arming, Training, Directing Terror Groups in Iraq, U.S. Official Says*, AM. FORCES
PRESS                SERV.                (July                3,                2007),
https://www.army.mil/article/3890/iran_arming_training_directing_terror_groups_in_iraq_u_s_o
fficial_says (last visited March 17, 2025).

[61] *See* Felter & Fishman, *Iranian Strategy in Iraq*, at 66 (citing U.S. Intelligence Report IR 011).

[62] *Id.* at 57.

[63] Garamone, *Iran, Arming, Training, Directing Terror Groups in Iraq, U.S. Official Says*, *supra* note 60.

well inside the country through several well-organized ratlines, a mirror image of those moving weapons into Iraq.  According to the statements of Iraqi detainees, Amara, a city in southeastern Iraq, served as a hub for the movement of militants into Iran.  Iraqi militants flocked to Mahdi Army and Special Groups safe houses in Amara from the predominantly Shia areas where they were recruited."  Levitt Report.

3.63    "Some trainees reported crossing the border legally, others illegally.  Either way, once across they met Iranian guides who escorted them to safe houses and hotels in the nearby Iranian border towns of Ahvez and Kermanshah.  From there, the IRGC-QF arranged for the trainees to catch flights to Tehran.  Once in Iran's capital, Special Groups members stayed in apartments on the city's outskirts, where preliminary training took place indoors. Trainees also described riding a bus two or three hours away from Tehran to 'military style training complexes manned by uniformed Iranian soldiers.[64]"  Levitt Report.

3.64    Despite the pledges of senior Iranian leaders to cease such support, Defense Intelligence Agency Director Ronald Burgess told Congress in 2010 that the "[Iranian] Revolutionary Guards continues to covertly provide money, weapons, safe haven and training to select Iraqi Shia militants and terrorists."[65]  Burgess added that, in Iraq, the "Iranian Islamic Revolutionary Guard Corps (IRGC) … trains and provides weapons and logistics support to Lebanese Hizballah.  In turn, Lebanese Hizballah is training Iraqi insurgents at Iran's behest, providing them with tactics and technology to attack U.S. interests."[66]  The focus of this

---

[64] Felter & Fishman, *Iranian Strategy in Iraq*, at 59.

[65] *World Wide Threat Assessment: Statement before the Comm. on Armed Services Joint Hearing* 112th Cong., 1st Sess. (March 10, 2011) (statement of Lt. Gen. Ronald L. Burgess Jr., Dir., Defense Intelligence Agency).

[66] *Id.*

training was to provide "elite trainees" with the "training, tactics, and technology" to handle IEDs and EFP and execute other acts of terrorism like assassinations.[67]" *See* Levitt Report.

    **3.65**    "Over the course of 2006–2007, several Special Groups members noted in their debriefings, 16 operatives made several trips to Iran to take the master trainer course. Four specialized in EFPs; four in mortars and rockets; four in conventional weapons; and four in tactical and guerrilla warfare….[68] In April 2008, a U.S. senator asked General Petraeus if it would be fair to say that Iranian-backed Special Groups in Iraq were responsible for killing hundreds of American soldiers and thousands of Iraqi soldiers and civilians. 'It certainly is,' Petraeus answered.[69]" Levitt Report.

    **3.66**    "Wherever they trained, Iraqi militants could never have been as lethally effective as they were without the *$750,000 to $3 million a month* in funding and arms they received from Iran. 'Without this support,' U.S. military authorities concluded, 'these special groups would be hard pressed to conduct their operations in Iraq.'[70] Asked the source of the 107-millimeter rockets Shia insurgents were firing on the Green Zone in Baghdad, General Petraeus replied succinctly, 'They come from Iran.'[71] By early 2008, 107-millimeter rockets were turning up in seized weapons caches, with 45 found in one cache alone, which also

---

[67] Garamone, *Iran, Arming, Training, Directing Terror Groups in Iraq, U.S. Official Says*, *supra* note 60.

[68] *See* Felter & Fishman, *Iranian Strategy in Iraq* (discussing IR009, IR0013, IR0011, and IR0016).

[69] *The Situation in Iraq and Progress by the Government of Iraq in Meeting Benchmarks and Achieving Reconciliation: Hearing before the Comm. on Armed Services*, 110th Cong., 2d sess., (April 8-10, 2008) (statements of Gen. David H. Petraeus and Ambassador Ryan Crocker), *available at* https://www.govinfo.gov/content/pkg/CHRG-110shrg45666/html/CHRG-110shrg45666.htm. (last visited March 17, 2025).

[70] Garamone, *Iran, Arming, Training, Directing Terror Groups in Iraq, U.S. Official Says*, *supra* note 60.

[71] *The Situation in Iraq and Progress by the Government of Iraq in Meeting Benchmarks and Achieving Reconciliation: Hearing before the Comm. on Armed Services,* 110th Cong., 2d Sess.

included several thousand pounds of explosives, all from Iran. Included among detainees who explained the Special Groups' process to officials were IRGC-QF operatives and Special Groups leaders and financiers.[72]" Levitt Report (emphasis added).

3.67    "As a result of Iran and Hezbollah's training program, the Special Groups quickly became one of the most pressing security challenges in Iraq. 'Unchecked,' General Petraeus told the Senate Armed Services Committee in April 2008, 'the special groups pose the greatest long- term threat to the viability of a democratic Iraq.'[73]" Levitt Report.

3.68    "Over time Hezbollah provided the Iraqi insurgents 'with the training, tactics and technology to conduct kidnappings, small unit tactical operations, and employ sophisticated improvised explosive devices (IEDs), incorporating lessons learned from operations in Southern Lebanon,' according to an April 2010 Pentagon report.[74]" Levitt Report.

3.69    Although the United States has recognized Hezbollah as a Terrorist Group since the 1990s,[75] in October 2007, the U.S. Government also designated the Qods Force, a branch of the Islamic Revolutionary Guard Corps (IRGC), as a Terrorist Group.[76] Specifically, the Department of State concluded that the Qods Force has a long history of providing Hezbollah

---

[72] *Id.*

[73] *The Situation in Iraq and Progress by the Government of Iraq in Meeting Benchmarks and Achieving Reconciliation: Hearing before the Comm. on Armed Services,* 110th Cong., 2d Sess.

[74] SEC'Y OF DEF., *Unclassified Report on Military Power in Iran* (April 2010), at 3, *available at* https://fas.org/man/eprint/dod_iran_2010.pdf (last visited March 17, 2025).

[75] *See supra* note 28.

[76] Press Release, *Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority*, U.S. DEP'T OF STATE (Oct. 25, 2017), https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm (last visited March 17, 2025).

with "funding, weapons, intelligence, and logistical support."[77]  The Department of State also determined that the Qods Force provides "lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.[78]"  Levitt Report.

**E.    U.S. Military/Intelligence Efforts to Curb Iran's Deadly Influence in Iraq**

3.70    "Sometime in 2006, at the height of sectarian violence then engulfing Iraq, IRGC-QF Gen. Soleimani traveled secretly to Baghdad.  Only after he returned safely to Iran did U.S. intelligence and military forces discover he had been right in their backyard.[79] Washington was furious.  Ever since the April 2005 [Iraqi] election, Iranian-sponsored Shia militants had intensified attacks targeting coalition forces in Iraq.  Now, Soleimani's confidence in his political and military proxies in Iraq was apparently so great that he felt secure paying a house call to Baghdad.  Correspondingly the IRGC-QF seemed to be riding high, deploying proxy groups in Iraq capable of striking at coalition forces with impunity and basking in Hezbollah's self-declared victory against the Israel Defense Forces in the July 2006 war." Levitt Report.

3.71    "That same summer, the White House began a process of reviewing its policy toward Iranian meddling in Iraq.  Over the course of 2006, coalition forces detained dozens of suspected Iranian operatives in a 'catch and release' program intended to signal to Iran the

---

[77] *Id*.

[78] Press Release, *Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority*, *supra* note 76.

[79] Martin Chulov, *Qassem Suleimani: The Iranian General 'secretly running' Iraq*, GUARDIAN (London) (July 28, 2011), https://www.theguardian.com/world/2011/jul/28/qassem-suleimani-iran-iraq-influence (last visited March 21, 2025).

coalition's awareness of Tehran's aggressive activities in Iraq.  DNA samples collected surreptitiously from the Iranian detainees were added to a database before they were released after three or four days in custody.  According to U.S. intelligence, as many as 150 Iranian intelligence and IRGC operatives were deployed to Iraq at a time.[80]"  Levitt Report.

     **3.72**    Explaining the reason for the policy review, a senior Bush Administration commented that there "were no costs for the Iranians."[81]  "The resulting presidential directive, or 'finding,' was signed by President Bush in November 2006 and authorized U.S. forces to kill or capture Iranian operatives in Iraq.  Coined Counter Iranian Influence, the initiative included measures to roll back Iranian successes in five different theaters from Lebanon to Afghanistan and isolate the regime in Tehran.  In Lebanon, for example, the White House authorized the intelligence community to engage in broadened operations targeting Hezbollah's engagement in a spectrum of activities called the Blue Game Matrix.[82]"  Levitt Report.

     **3.73**    "In Iraq the program to counter Iranian influence quickly bore fruit.  The evening of December 19, 2006, a U.S. military patrol stopped an official Iranian embassy vehicle in Baghdad and arrested three Iranians with diplomatic credentials and one Iraqi, presumably their driver.[83]"  Levitt Report.

---

[80] David Stout, *Bush authorizes U.S. Troops to kill Iranian agents in Iraq*, N.Y. TIMES (Jan. 26, 2007), https://www.nytimes.com/2007/01/26/world/americas/26iht-prexy.4361797.html (last visited March 17, 2025).

[81] Sabrina Tavernise, *U.S. Says Captured Iranians Can be Linked to Attacks*, N.Y. TIMES (Dec. 27, 2006), https://www.nytimes.com/2006/12/27/world/middleeast/27iranians.html (last visited March 17, 2025).

[82] *Id.*

[83] Tavernise, *U.S. Says Captured Iranians Can be Linked to Attacks*, *supra* note 81.

**3.74**     "The more significant arrests, however, came just a few hours later in a predawn raid of the Baghdad compound of Abdul Aziz al-Hakim, head of the SCIRI.  U.S. Special Forces detained ten men in this second raid, including two Iranians carrying diplomatic passports—passports later determined to have been issued under false identities.  Neither of the Iranians, traveling in Iraq under aliases with false documents, was a diplomat in the traditional sense.  In fact they were important IRGC officials on a covert mission to Iraq.  One, Mohsen Chizari, was the IRGC-QF's third highest ranking officer.  The Iranians quickly realized that U.S. forces were holding one of Gen. Soleimani's most senior deputies.[84]"  Levitt Report.

**3.75**     "The evidence amounted to a 'smoking gun,' in one American official's description.  'We found plans for attacks, phone numbers affiliated with Sunni bad guys, a lot of things that filled in the blanks on what these guys are up to.'[85]  The evidence the military collected in the raid included maps, detailed weapons lists, reports of weapons shipped into Iraq, organization charts, telephone records, computers, and 'other sensitive intelligence information.'[86]  According to U.S. officials, some of this intelligence 'dealt explicitly with force-protection issues, including attacks on MNF-I [Multi-National Force-Iraq] forces.'[87]"  Levitt Report.

---

[84] Sudarsan Raghavan and Robin Wright, *Iraq Expels 2 Iranians Detained by U.S. American Defense Official Calls Release 'Obviously Troubling'*, WASH. POST (Dec. 30, 2006) https://www.washingtonpost.com/archive/politics/2006/12/30/iraq-expels-2-iranians-detained-by-us-span-classbankheadamerican-defense-official-calls-release-obviously-troublingspan/f9f56a51-bd96-418f-9267-e8d63d7d80b8/ (last visited March 17, 2025).

[85] Eli Lake, *Iran's Secret Plan for Mayhem*, N.Y. SUN (Jan. 3, 2007), https://www.nysun.com/foreign/irans-secret-plan-for-mayhem/46032/ (last visited March 17, 2025).

[86] Raghavan & Wright, *Iraq Expels 2 Iranians Detained by U.S. American Defense Official Calls Release 'Obviously Troubling.'*, *supra* note 84.

[87] Tavernise, *U.S. Says Captured Iranians Can be Linked to Attacks*, *supra* note 81.

3.76    "Chizari's arrest clearly unnerved Iran.  Over the next few days, an Iraqi official noted, the Iranian ambassador to Iraq desperately ran 'around from office to office,' in an effort to secure Chizari's release.[88] …  A few days later, on January 11, 2007, former CIA director R. James Woolsey Jr. and former undersecretary of state Thomas Pickering appeared before the U.S. House Foreign Affairs Committee to testify on 'The Next Steps in the Iran Crisis.'  Just the day before, President Bush had given a national address, noting, '*Iran is providing material support for attacks on American troops.*'[89]"  Levitt Report (emphasis added).

3.77    "Then, just a few hours before the hearing, U.S. troops arrested six more Iranians in an Iranian diplomatic office in Irbil in Kurdish-controlled northern Iraq.  One individual was quickly released, but the other five were determined to be IRGC members, not diplomats.  Publicly, the Iranian liaison office in Irbil processed papers for Iraqis attempting to travel to Iran.  But intelligence indicated it doubled as a IRGC-QF base of operations.  As U.S. Special Forces entered, they found the Iranians frantically flushing documents down a toilet.[90]"  Levitt Report.

3.78    "Mining data on seized cell phones indicated the officers were in direct contact with a wide array of insurgent groups.  Analysts found in the seized materials and devices evidence tying the Iranian officers to military operations carried out not only by Shia cleric

---

[88] James Glanz & Sabrina Tavernise, *U.S. is Holding Iranians Seized in Raids in Iraq*, N.Y. TIMES (Dec. 25, 2006), https://www.nytimes.com/2006/12/25/world/middleeast/25iraq.html (last visited March 17, 2025).

[89] President George W. Bush, *Speech on the U.S. Mission in Iraq* (Jan. 10, 2007) (transcript available at https://www.npr.org/templates/story/story.php?storyId=6803354) (last visited March 17, 2025).

[90] James Glanz, *U.S. Says Arms Link Iranians to Iraqi Shiites*, N.Y. TIMES (Feb. 12, 2007), https://www.nytimes.com/2007/02/12/world/middleeast/12weapons.html (last visited March 17, 2025).

Muqtada al-Sadr's Mahdi Army (Jaish al-Islam) in places like Kirkuk but also by the al-Qaeda-affiliated Ansar al-Sunna group targeting Iraqi Kurds.[91]" Levitt Report.

 **3.79** The training and weapons provided by Iran and its agents resulted in an increased lethality and effectiveness of the Terrorist Attacks, and included sophisticated tell-tale tactics that had not previously been seen in Iraq prior to infusion of Iranian agents, Hezbollah and the IRGC-QF in 2003.

**F.** **Iranian Signature Weapons used in Terrorist Attacks: Explosively Formed Penetrators and Improvised Explosive Devices**

 **3.80** One of Iran's primary forms of material support and/or resources that facilitated extrajudicial killings, resulting in death or injury to U.S. citizens in Iraq, was the financing, manufacturing, and deployment of IEDs and EFPs.

 **3.81** IED is a term commonly used by the U.S. military as a byword for a roadside bomb. The Terrorist Groups consistently sought to attempt to improve IED effectiveness and sophistication.[92]

 **3.82** U.S. Special Representative to Iran Brian Hook noted with respect to the 608 deaths in Iraq that were caused by Iran: "These casualties were the result of explosively formed penetrators (EFP), other improvised explosive devices (IED), improvised rocket-

---

[91] Eli Lake, *U.S. Deadlocked on Whether to Free Iranian Terror Suspects*, N.Y. SUN (Jan. 19, 2007), https://www.nysun.com/foreign/us-deadlocked-on-whether-to-free-iranian-terror/47015/ (last visited March 17, 2025).

[92] Edward T. Pound, *Special Report: The Iran Connection*, U.S. NEWS & WORLD REP. (Nov. 22, 2004).

assisted munitions (IRAM), rockets, mortars, rocket-propelled grenades (RPG), small-arms, sniper, and other attacks in Iraq."[93]

3.83    Likewise, in a July 29, 2015 Senate Armed Services Committee hearing, Senator Ted Cruz said, "[T]he Joint Personnel Recovery Agency has a classified list of roughly 500 American soldiers who were murdered by Iranian IEDs."[94]

3.84    EFPs, IEDs, and other deadly weapons were typically smuggled from Iran to Iraq, and the IRGC-QF played a vital role in that process.

3.85    Additionally, in Iraq, the IRGC and Hezbollah supplied and trained various Special Groups to deploy EFPs and IEDs.

3.86    An EFP (pictured in Figure 1 and Figure 2)[95] is a technologically advanced Improvised Explosive Device (IED) designed to destroy even the strongest military-grade Humvees.  *See Karcher*, 396 F. Supp. 3d 12, 26-27 (D.D.C. 2019).  In *Karcher*, this Court held that Iran provided EFPs to enemy forces in Baghdad during Operation Iraqi Freedom.  *Id*. at 15.  In turn, the EFPs were involved in six (6) terrorist attacks that tragically killed members of the U.S. Armed Forces.  *Id*. at 15-25.

3.87    EFPs are a particularly effective form of manufactured IED and are sometimes known as a "shaped charge," usually made with a manufactured concave copper disk and a high explosive packed behind the liner.

---

[93] Kyle Rempfer, *Iran Killed More U.S. Troops in Iraq Than Previously Known, Pentagon Says*, MILITARY TIMES (Apr. 4, 2019), https://www.militarytimes.com/news/your-military/2019/04/04/iran-killed-more-us-troops-in-iraq-than-previously-known-pentagon-says/ (last accessed March 21, 2025).

[94] KIMBERLY KAGAN, THE SURGE: A MILITARY HISTORY 50 (Encounter Broadsides 2010).

[95] *See infra* pp. 41-42.

3.88     The EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised" explosive devices (although often referred to as IEDs) but professionally manufactured and specifically designed to target U.S. nationals, including Plaintiffs, and Coalition Forces' armor.  These EFPs cannot be made without specific machinery, access to which Iran controls, and without which Special Groups and other terrorist organizations could not obtain or use these munitions.

3.89     EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(2)(A).

3.90     In Iraq, EFPs were often triggered by various technologies, including passive infra-red sensors (tripped by the engine heat of passing vehicles) and radio frequency modules (triggering the weapon when high-powered radio waves were generated by Coalition Forces' jamming devices), which set off an explosion within the steel casing of the EFP.  This forced the copper disk forward and turned it into a high-velocity molten slug, traveling at over a mile per second, that could pierce the military-grade armor of most U.S. vehicles deployed in Iraq up to 300 feet away.

3.91     Metallurgic analysis by U.S. technicians helped confirm the high-purity copper EFP liners were not generally produced in Iraq.

3.92     Differences in the liners indicated the kind of press that was required to fabricate them—a heavy (hydraulic) press not commonly seen in Iraq.

3.93     To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs.  These discs are annealed in a furnace to soften the copper.  The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

3.94    The hydraulic press machinery was transported to Iran by Iran's national maritime carrier, Islamic Republic of Iran Shipping Line ("IRISL").

3.95    This munitions manufacturing process—which is critical to the design and concomitant lethality of the weapon—is controlled by Iran.

3.96    EFPs are simply a more sophisticated explosive devices and the terms EFP and IED were often used interchangeably when describing attacks in Iraq by terrorist groups. These more advanced IEDs were designed specifically to target vehicles such as armored patrols and supply convoys, though Hezbollah and the Special Groups have deployed them against U.S. and Iraqi civilians as well.

3.97    "A press briefing was prepared for Sunday, February 11, 2007, in Baghdad's Green Zone. Laid out on the table were EFP launchers and their shaped metal charges, mortar shells, rocket-propelled grenades, and the false identification cards found on two of the IRGC-QF officials captured in the Irbil raid a month earlier. According to U.S. officials, serial numbers on some of the grenades indicated they were manufactured in Iran in 2006.[96]" Levitt Report.

3.98    "The centerpiece of the weapons spread was the EFP, a deceptively simple-looking cylinder with a copper liner, launched with such force that it could penetrate the armor of a tank or up-armored Humvee. The briefing was more than just a show-and-tell, however. Though unable to share the intelligence underpinning the charge, the military and intelligence briefers insisted the IRGC-QF was responsible for the flow of arms to Shia militia groups. 'We have been able to determine that this material, especially on the EFP level, is coming from the

---

[96] Glanz, *U.S. Says Arms Link Iranians to Iraqi Shiites*, *supra* note 90.

IRGC-Qods Force,' the intelligence analyst stated.  In reality, they report directly to the "supreme leader," a reference to Ayatollah Alj Khamenei.'[97]"  Levitt Report.

**3.99**    "In September 2007, U.S. forces in Iraqi Kurdistan arrested Mahmoud Farhadi, a 'very senior member of the Qods Force.'  Posing as an Iranian trade representative, Farhadi's actual mission involved facilitating the transport of weapons into Iraq, according to a U.S. military spokesman.  In particular he oversaw the smuggling of 'weapons, people and money' across the border from Iran.[98]"  Levitt Report.

**3.100**    "The capture of senior IRGC-QF officials, and the public airing of evidence demonstrating Iranian agents were arming and training Iraqi Shia extremists, embarrassed Tehran and appears to have accelerated Iran's efforts to put an Arab face on this mission.  Using Hezbollah offered multiple advantages, not least the shared language of Hezbollah operatives and Iraqi militants, Arabic.  Farsi-speaking Iranian trainers could not communicate with their trainees as effectively, aside from the perception by some Iraqis that their Iranian trainers were aloof and patronizing."  Levitt Report.

**3.101**    "Hezbollah's use of Iranian-manufactured EFPs in Lebanon, before and during the July 2006 war, positioned Hezbollah operatives with in-the-field experience as ideal candidates to train Iraqi Shia in deploying this particular weapon.[99]  A number of Iraqi Shia militants reportedly observed and trained alongside Hezbollah militants in Lebanon during the

---

[97] Glanz, *U.S. Says Arms Link Iranians to Iraqi Shiites*, *supra* note 90.

[98]    Press    Briefing,    *Multi-National    Force-Iraq*    (Oct.    3,    2007),    *available    at* https://www.globalsecurity.org/military/library/news/2007/10/mil-071003-mnfi-b01.htm (last visited  March  17, 2025).

[99] Kimberly Kagan, *Iran's Proxy War against the United States and the Iraqi Government*, INST. FOR STUD. OF    WAR    (May    2006    –    Aug.    20,    2007),    *available    at* http://www.understandingwar.org/sites/default/files/reports/IraqReport06.pdf (last visited March 17, 2025).

2006 war, according to U.S. intelligence.[100]  Having seen Hezbollah in action, they were well situated to seek training from their Lebanese compatriots in the use of EFPs and other weapons and tactics."  Levitt Report.

    **3.102**     "In early 2008, IRGC-QF General Qasem Soleimani sent General Petraeus, the commander of coalition forces in Iraq, a message making it clear that he (Soleimani) was point-man for Iranian policy and activities in Iraq.  Conveyed by a senior Iraqi leader, the message arrived just as Iraqi and coalition forces initiated Operation Charge of the Knights, an effort targeting Iraqi Shia militias in Baghdad and Basra.  The message itself read: 'Dear General Petraeus, you should know that I, Qassem Suleimani, control the policy for Iran with respect to Iraq, Lebanon, Gaza, and Afghanistan.  And indeed, the ambassador in Baghdad is a Quds Force member.  The individual who's going to replace him is a Quds Force member.'[101]  The message should have come as no great surprise, coming from a man aggressive in the belief that "offense is the best defense.'[102]"  Levitt Report.

---

[100] Gordon & Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, *supra* note 54.

[101]     Dexter   Filkins,   *The   Shadow   Commander*,   NEW   YORKER   (Sep.   23,   2013), https://www.newyorker.com/magazine/2013/09/30/the-shadow-commander (last visited March 17. 2025).

[102] Ali Alfoneh, *Iran's Most Dangerous General* (July 2011), AM. ENTER. INST. FOR PUB. POL'Y RSCH., *available at* https://www.aei.org/wp-content/uploads/2011/10/MEO-2011-07-No-4-g.pdf?x88519 (last visited March 17, 2025).



**Figure 1**[103]

---

[103] *Karcher*, Case No. 1:16-cv-232-CKK, Dkt. 84-4, at p.8 (Expert Report of Cpt. Donald Barker).

**41**



**Figure 2**[104]

### G.    Iranian Operatives and IRGC-Trained Militia Groups' Use of Improvised Explosive Devices

 **3.103** One way that the IRGC provided "militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed penetrators (EFPs) that were specially designed to defeat armored vehicles" was to provide them with manufacturing supplies such as copper and steel, as well as machinery—including hydraulic presses used to form copper into the shape of disks used in EFPs.

---

[104] *Id.* at p. 7.

**3.104**    Iran propagated its specialized weapons knowledge up and down its network of terror proxies in Iraq.  The U.S. State Department documented this in its 2006 Country Reports on Terrorism regarding Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. nationals, including Plaintiffs, and other Coalition Forces:

> *Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks.* Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah.  The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. *The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology.  These individuals then passed on this training to additional militants in Iraq.*

(emphasis added).

**3.105**    As reported by the *New York Times* on March 26, 2007, U.S. Army officials believe that terrorists first began using EFPs in Iraq in August 2003.

**3.106**    In December 2003, Coalition Forces recovered radio equipment that was most likely intended for use with EFPs in Iraq.

**3.107**    In December 2004, Coalition Forces recovered passive infrared sensors modified for use with EFPs.

**3.108**    Although Iran's use of EFPs was publicly disclosed by U.S. and British officials in 2005—when the two countries issued diplomatic protests—the official, public identification of specific attacks as EFP attacks was in 2010.

**3.109**    In 2006, the U.S. State Department's Country Reports on Terrorism again documented Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. nationals, including Plaintiffs, and other Coalition Forces, reiterating:

Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah.  The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. *The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated lED technology.  These individuals then passed on this training to additional militants in Iraq.*

(emphasis added).

**3.110**    Also in 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force-Iraq stated, "Iran is definitely a destabilizing force in Iraq.  I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."[105]

**3.111**    Brigadier Gen. Kevin Bergner commented on Iran funding of Hezbollah operatives in Iraq:

> Actions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq. … Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups.  … 'It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities.' … 'And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.' … The groups operate throughout Iraq.  They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel.  They receive arms—including explosively formed penetrators, the most deadly form of improvised explosive device—and funding from Iran.  They also have received planning help and orders from Iran.[106]

---

[105] *DoD News Briefing with Brig. Gen. Barbero from the Pentagon*, GLOBALSECURITY.ORG (Aug. 23, 2006), https://www.globalsecurity.org/military///library/news/2006/08/mil-060823-dod03.htm#google_vignette (last visited March 17, 2025).

[106] Jim Garamone, *Iran Arming, Training, Directing Terror Groups in Iraq, U.S. Official Says*, U.S. ARMY (July                                                3,                                                2007),

**3.112**    In May 2007, the Commander of the Multinational Division-Center, U.S. Army Major General Richard Lynch, confirmed that "[m]ost of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers—IEDs.  And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded.  *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.*  The EFPs are killing our soldiers, and we can trace that back to Iran."[107]

**3.113**    That same year, the Deputy Chief of Staff for Intelligence with the MNF-I, U.S. Army Major General Richard Zahner, explained:

> Labels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq.    …  Iran is funneling millions of dollars for military goods into Iraq. …  You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer.

Major General Zahner further added:

> [T]he control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there.  It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities.

**3.114**    According to the U.S. State Department's 2007 Country Reports on Terrorism:

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians.  In this way, Iranian government forces have been responsible for attacks

---

https://www.army.mil/article/3890/iran_arming_training_directing_terror_groups_in_iraq_u_s_official_says (last visited March 21, 2025).

[107] *DoD News Briefing with Maj. Gen. Lynch from Baghdad*, GLOBALSECURITY.ORG (May 4, 2007), https://www.globalsecurity.org/military///library/news/2007/05/mil-070504-dod03.htm (last visited March 17, 2025) (emphasis added).

on Coalition forces. *The Islamic Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces*, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

(emphasis added).

**3.115**    Other U.S. Government reports, such as the Department of Defense's December 2007 "Measuring Stability and Security in Iraq" quarterly report to Congress, similarly concluded that Iranian Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) efforts to train, equip, and fund Shia extremists also continued despite reported assurances to Prime Minister Maliki that Iran would cease lethal aid.

**3.116**    These observations continued in 2008. According to the U.S. State Department's 2008 Country Reports on Terrorism:

The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan … Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided

training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

**3.117**    Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted as saying that "fesh forensic testing on weapons used in the latest deadly attacks in the country bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons and training. … We're not talking about a smoking pistol. There is no doubt this is Iranian."

**3.118**    Further, the State Department's 2011 Country Reports on Terrorism reported: "Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF, in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry."

**3.119**    Iran also introduced other weapons into Iraq for the purpose of supporting terrorist attacks on U.S. nationals and coalition personnel, including Plaintiffs. These included 81 mm mortars (the remainder of the region uses 82 mm mortars), repainted 107 mm rockets imported into Iran from China and marked for sale in the open markets, 60 mm canisters filled with Iranian-manufactured mortar rounds; 240 mm rockets, IRAMs, RPG-7s, RPG-29s, and RKG-3 armor penetrating anti-tank grenades deployed by the Terrorist Groups in various acts of international terrorism, including the Terrorist Attacks wherein Plaintiffs and/or Plaintiffs' family members were killed, maimed, or otherwise injured.

**3.120**    The presence of these weapons shows a high level of sophistication of the

Iranian arms flow into Iraq as the purchases are made by the Iranian regime.

**3.121**    U.S. Special Representative for Iran, Brian Hook, stated during an April 4, 2019

press conference that "Iran is responsible for the deaths of at least 608 American service

members.  This accounts for 17 percent of all deaths of U.S. personnel in Iraq from 2003 to

2011.  This death toll is in addition to the many thousands of Iraqis killed by the IRGC's

proxies."[108]

**3.122**    Numerous Iranian proxies and Special Groups have used IEDs against the

troops in Iraq.

**3.123**    On June 23, 2006, the BBC reported:

BBC world affairs correspondent, Paul Reynolds, says both the American and
British military in Iraq have claimed for some time that Iran, or factions within the
Iranian government, have been supporting Shias politically and militarily.
. . .
"Since January we have seen an upsurge in their support, particularly to the Shia
extremist groups," Gen Casey said.  "They are using surrogates to conduct terrorist
operations both against us and against the Iraqi people."  "*We are quite confident
that the Iranians, through the special operations forces, are providing weapons,
IED [improvised explosive device] technology and training to Shia extremist
groups in Iraq.*"

(emphasis added).

**3.124**    In another example, on September 26, 2008, CNN reported that U.S. officials

claimed Iran had provided Shia militias in Iraq with "millions of dollars" in funding and that:

The official said that high-grade military explosives and specialized timers are
among the "boutique military equipment" moving from Iran into Iraq.  Some of
the equipment is of the same type that Hezbollah, an Iranian-backed Shiite militia,
used against Israeli forces in Lebanon during the summer, the official said.  The

---

[108] U.S. DEP'T OF STATE, Press Briefing (Apr. 2, 2019), https://2017-2021.state.gov/briefings/department-press-briefing-april-2-2019/ (last visited March 21, 2025).

origin of the weapons was easy to discern because of *Iranian markings* on it, he said. Because Iran maintains tight control over armaments, he said, shipment of the weapons into Iraq had to involve "*elements associated with the Iranian government.*"

(emphasis added).

  **3.125** On January 9, 2008, the U.S. Treasury Department designated four individuals and one entity under E.O. 13438 for threatening the peace and stability of Iraq and the government of Iraq. Three of the individuals, Ahmed Foruzandeh (a Brigadier General in the IRGC-QF), Abu Mustafa Al-Sheibani, and Isma'il Hafiz Al Lami (a/k/a "Abu Dura") were all based in Iran and/or received funding from Iran.

  **3.126** Regarding the designation of Abu Mustafa Al-Sheibani, the January 9, 2008 Treasury Department press release stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. *Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network. Al-Sheibani's network—consisting of several hundred members—conducted IED attacks against Americans in the Baghdad region.* As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq. Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars, Katyusha rockets, and anti-tank landmines.

(emphasis added).

**3.127**    A July 2, 2009 press release by the U.S. Treasury Department designated Kata'ib Hizballah ("KH"), Iran's go-to terror group in Iraq that received support from Lebanese Hezbollah, as an SGDT pursuant to E.O. 13438.  The Treasury Department's press release stated:

> As of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah.  In one instance, *Hizballah provided training—to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks—to Kata'ib Hizballah members in Iran*.

(emphasis added).

**3.128**    As noted above—and as stated by the U.S. Treasury Department in its July 2009 press release—throughout 2008, Al-Manar, Lebanon Hezbollah's official television outlet in Lebanon (itself a designated SDGT since May 2006), played numerous videos of KH launching rocket and IED attacks against U.S. troops in Iraq.  In this manner, Hezbollah helped publicize KH's activities and increase its profile among leading Shia terrorist groups.

**H.    Iran's Responsibility for the Terrorist Attacks at Issue**

**3.129**    In sum, Dr. Levitt's professional opinion is "that the Iraqi Shia militias, including JAM, and so called Special Groups like AAH, Kata'ib Hezballah and Promised Day brigades, were provided active guidance, training, intelligence support, and financial and material support by Iran through its IRGC and its proxy Lebanese Hezbollah."  Accordingly, Levitt concludes that "*thousands of attacks on U.S. and coalition forces were launched between 2004 and 2011 by Iraqi Shia militias with the IRGC's and Lebanese Hezbollah's active logistical support*."  Levitt Report (emphasis added).

**3.130**    More pointedly, on June 25, 2019, President Donald Trump clarified through his official Twitter account that the number of deaths and injuries to U.S. military personnel

attributable to Iran was much higher than initially disclosed.  President Trump stated, "*The U.S. has not forgotten Iran's use of IED's [and] EFP's (bombs), which killed 2000 Americans, and wounded many more …*" (emphasis added).[109]



**3.131**    Iran still presents a grave danger to U.S. service members in Iraq.  For instance, according to a 2020 U.S. Department of State Report, Iran has "maintained decades-long relationships with a variety of Shia militant groups (SMGs), many of whom have deployed Iranian weapons against U.S. military personnel."  U.S. DEP'T OF STATE, OUTLAW REGIME: A CHRONICLE OF IRAN'S DESTRUCTIVE ACTIVITIES (Sep. 19, 2020) at 12, https://www.state.gov/wp-content/uploads/2020/09/Outlaw-Regime-2020-A-Chronicle-of-Irans-Destabilizing-Activity.pdf (last visited Mar. 17, 2025).  Many of these militant groups have deployed Iranian weapons against U.S. military personnel operating in Iraq, including

---

[109]    Donald    J.    Trump    (@realDonaldTrump),    TWITTER    (June    25,    2019), https://twitter.com/realdonaldtrump/status/1143529907403788288?lang=en (as accessed Mar. 17, 2025); *see also* https://www.presidency.ucsb.edu/documents/tweets-june-25-2019 (recording the Tweet for posterity).

multiple rocket attacks since 2019. *See id.* Thus, the Department of State determined that "Iran's support for Shia militants in Iraq remains the primary threat to US personnel there." *Id.* at 13.

**3.132**    Additionally, in April 2019, Brian Hook, Senior Advisor to the Secretary of State, offered the following statement: "In Iraq, I can announce today, based on declassified U.S. military reports, that Iran is responsible for the deaths of at least 608 American service members." U.S. DEP'T OF STATE, Press Briefing (Apr. 2, 2019), *available at* https://2017-2021.state.gov/briefings/department-press-briefing-april-2-2019/ (last visited March 21, 2025). This figure does not include the thousands of Iraqis killed by the IRGC's proxies.

**3.133**    Therefore, as seen herein, since the early 2000s the Islamic Republic of Iran has continued its practice of "providing funding, training, weapons, and equipment" to numerous terrorist groups operating in Iraq. *See* U.S. DEP'T OF STATE, OUTLAW REGIME: A CHRONICLE OF IRAN'S DESTRUCTIVE ACTIVITIES, at 11–12, 24. The goal of Iran's longstanding effort is to instigate conflict in the Middle East and ultimately "assert itself as the region's dominant power and export its authorization system of government." *Id.* at 11.

**3.134**    For these reasons, Plaintiffs contend that Defendant Iran, by and through the active support of the IRGC, IRGC-QF, and/or Special Groups, provided material support and resources to the enemy forces who committed the Thirty (30) Terrorist Attacks at issue in this action.[110] Thus, Iran is liable for monetary damages proximately caused by the deaths and

---

[110] *See, e.g.*, *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 80-81 (D.D.C. 2017) (concluding that "it is well established by courts in this district" that the IRGC is the functional equivalent of Iran and qualifies as a foreign state under the FSIA); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 74 (D.D.C. 2010) (holding that Hezbollah acts at Iran's behest and is therefore an agent of Iran).

other personal injuries suffered by Plaintiffs as a result of these attacks.  28 U.S.C. § 1605A(c);

*Karcher,* 396 F. Supp. 3d at 54.

## I.    The Terrorist Attacks At Issue

**3.135**    The following five (5) Plaintiffs are immediate family members of former U.S.

Armed Forces members and U.S. Government contractors who were tragically killed in action

(KIA) in Iraq during Operation Iraqi Freedom.  Because of their tragic loss, these Plaintiffs

suffered monetary damages as described herein.

### 1.    The December 25, 2005 Terrorist Attack - Baghdad, Iraq
**Plaintiff: Anthony Cardinal Family**
**Global**

a.  Anthony Cardinal was a citizen of the United States and was domiciled in the State of Georgia.

b.  Plaintiff Amber Lawrence is a citizen of the United States and is domiciled in the State of Michigan.  She is the widow of Anthony Cardinal.

c.  Plaintiff Mikel Cardinal is a citizen of the United States and is domiciled in the State of Michigan.  He is the son of Anthony Cardinal.

d.  Plaintiff Maylee Cardinal is a citizen of the United States and is domiciled in the State of Michigan.  She is the daughter of Anthony Cardinal.

e.  Anthony Cardinal was a member of the United States Army and served as a specialist in the 3rd Squadron, 7th Cavalry Regiment, 2nd Brigade, 3rd Infantry Division out of Fort Stewart, Georgia.  He was deployed to Baghdad, Iraq.  On December 25, 2005, Christmas Day, Spc. Cardinal was conducting combat operations in Baghdad.  He was driving the lead vehicle in a three-vehicle convoy when an EFP detonated near his Humvee killing Spc. Cardinal. At the time of the tragic death, Anthony Cardinal was a United States citizen and a member of the armed forces under 28 U.S.C § 1605A(c).

f.  The December 25, 2005 Terrorist Attack committed against Anthony Cardinal constitutes an act of extrajudicial killing. In an October 3, 2022 Opinion, a Court in this District specifically concluded that it "finds Iran responsible for the December 25, 2005 EFP attack by supporting proxy forces who conducted the attack." *Stearns v. Islamic Republic of Iran*, 633 F. Supp. 3d 284, 324-25 (D.D.C. 2022).  The Court also specifically found that "Spc. Cardinal was injured in the blast and later died of his wounds." *Id*. at 324.  Thus, upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the

enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.[111]

g.  Amber Lawrence, Mikel Cardinal, and Maylee Cardinal bring this action individually and seek solatium damages for severe mental anguish, bereavement, grief, and loss of society and comfort suffered as a result of the untimely death of Anthony Cardinal.

### 2.  The January 6, 2005 Terrorist Attack - Baghdad, Iraq
### Plaintiff: Armand Frickey Family

a.  Armand Frickey was a citizen of the United States and was domiciled in the State of Louisiana.

b.  Plaintiff Denise Frickey is a citizen of the United States and is domiciled in the State of Mississippi.  She is the mother of Armand Frickey.

c.  Armand Frickey was a member of the United States Army National Guard and served as a Sergeant in the 256th Infantry Brigade out of Houma, Louisiana.  Mr. Frickey was deployed to Baghdad, Iraq.  On January 6, 2005, Frickey was traveling in an armored Bradley fighting vehicle with six of his fellow soldiers. Suddenly, the vehicle was struck by a nearby IED.  All seven solders traveling inside the vehicle, including Frickey, sustained fatal injuries as a result of this Terrorist Attack.  As a result of the attack, Frickey was KIA at the age of 20.  At the time of his tragic death, Armand Frickey was a United States citizen and a member of the armed forces under 28 U.S.C § 1605A(c).

d.  The January 6, 2005 Terrorist Attack committed against Armand Frickey constitutes an act of extrajudicial killing.  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to tactical training and furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.[112]

e.  Denise Frickey brings this action individually and seek solatium damages for severe mental anguish, bereavement, grief, and loss of society and comfort suffered as a result of the untimely death of Armand Frickey.

### 3.  The June 12, 2008 Terrorist Attack – Kadamiyah, Iraq

---

[111] *See, e.g.*, *Karcher,* 396 F. Supp. 3d at 15-25, 33 (concluding that there is sufficient evidence that Iran, through the IRGC and IRGC-QF provided EFPs to enemy forces in Iraq who used these weapons against the U.S. Armed Forces members).

[112] *See* Edward T. Pound & Jennifer Jack, *Special Report: The Iran Connection*, U.S. NEWS & WORLD REP., Nov. 22, 2004 (2003 U.S. and Israeli intelligence reports concluded that Hezbollah was training the Mahdi Army, an Iraqi militant group, at Iran's request and providing them weapons like RPGs).

**Plaintiff: John David Aragon Family**

a.  John David Aragon was a citizen of the United States and was domiciled in the State of California.

b.  Plaintiff Christina Aragon is a citizen of the United States and is domiciled in the State of South Dakota. She is the sister of John David Aragon.

c.  John Aragon enlisted in the United States Army and served as a Sergeant in the 1st Squadron, 75th Calvary Regiment out of Fort Campbell, Kentucky. He was deployed to Balad, Iraq. On June 12, 2008, Mr. Aragon was traveling in an up-armored Humvee in Kadamiyah, just northwest of Baghdad, when his vehicle was struck by an IED. Aragon sustained fatal injuries as a result of this Terrorist Attack and was KIA at the age of 22. At the time of his tragic death, John Aragon was a United States citizen and a member of the armed forces under 28 U.S.C § 1605A(c).

d.  The June 12, 2008 Terrorist Attack committed against John Aragon constitutes an act of extrajudicial killing. Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

e.  Christina Aragon brings this action individually and seeks solatium damages for severe mental anguish, bereavement, grief, and loss of society and comfort suffered as a result of the untimely death of John Aragon.

     **3.136**   The following Seventy-three (73) Plaintiffs are former U.S. Armed Forces members, and certain members of their immediate family. As detailed below, the former Armed Forces members were involved in specific Terrorist Attacks in Iraq during Operation Iraqi Freedom. Because of personal injuries suffered in these attacks, the Surviving-Plaintiffs suffered monetary damages as described herein.

## 1. The June 5, 2006 Terrorist Attack - Baghdad, Iraq
### Plaintiff: Donald Currier Family

a.  Plaintiff Donald Currier is a citizen of the United States and is domiciled in the State of California.

b.  Plaintiff Teri Currier is a United States citizen domiciled in the State of California. She is the wife of Donald Currier.

c.  Plaintiff Brett Currier is a United States citizen domiciled in the State of Texas.  He is the son of Donald Currier.

d.  Plaintiff Melissa Currier is a United States citizen domiciled in the State of California.  She is the daughter of Donald Currier.

e.  Donald Currier was a Colonel in the United States Army serving in the 49th Military Police Brigade out of Fairfield, California. He deployed to Baghdad, Iraq. On June 5, 2006, Currier was in a four-vehicle convoy traveling near Baghdad, Iraq in an up-armored Humvee equipped with Rhino Passive Infrared Defeat System ("Rhino") as a counter-IED measure. An EFP was fired and struck the convoy with shrapnel penetrating the vehicles and causing extensive damage. Copper fragments were recovered from the blast site.  Sgt. Isaac Lawson body was mangled by the EFP and he was KIA. Col. Currier was present as Sgt. Lawson died from his injuries. Col. Currier was injured but survived the terrorist attack.

f.  The June 5, 2006 Terrorist Attack against Donald Currier constitutes an act of extrajudicial killing because it resulted in the death of Isaac Lawson. 28 U.S.C § 1605A(a)(1). In an October 3, 2022 Opinion, this Court specifically concluded that it "finds Iran responsible for the June 5, 2006 EFP attack by supporting proxy forces who conducted the attack." *Stearns*, 633 F. Supp. 3d at 304. This Court also specifically found that the blast killed Isaac Lawson.  *Id.* Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

g.  As a result of the June 5, 2006 Terrorist Attack, Donald Currier sustained significant injuries, including a Traumatic Brain Injury (TBI) and Post-Traumatic Stress Disorder (PTSD).

h.  Because of these injuries, Donald Currier is entitled to past and future economic and noneconomic damages. Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity. Additionally, Teri Currier, Brett Currier, and Melissa Currier incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Donald Currier on June 5, 2006.

## 2.  The April 7, 2008 Terrorist Attack – Sadr City/Baghdad, Iraq
### Plaintiff: Ha-Nul Lee Family

a.  Plaintiff Ha-Nul Lee is a citizen of the United States. He is domiciled in the Philippines currently and was domiciled in Louisiana at the time of the attack.

b.  Ha-Nul Lee was a Staff Sergeant in the United States Army assigned to 4th Brigade Special Troops Battalion, 4th Brigade Combat Team, 10th Mountain Division out of Fort Polk,

Louisiana. He was deployed to Baghdad, Iraq. On April 7, 2008, Sgt. Lee was traveling near Sadr, City in an up-armored Humvee equipped with Rhino a seven-vehicle convoy to perform a post-blast analysis from another bomb attack. A multi-array EFP penetrated the armored Husky mine-detection vehicle in front of Sgt. Lee and immobilized the convoy. Copper was identified at the blast site. Sgt. Timothy Smith was KIA by the blast. Sgt. Lee was injured but survived the terrorist attack.

c.  The April 7, 2008 Terrorist Attack against Ha-Nul Lee constitutes an act of extrajudicial killing because it resulted in the death of Timothy Smith. 28 U.S.C § 1605A(a)(1). In an October 3, 2022 Opinion, this Court specifically concluded that it "finds satisfactory evidence in the record to demonstrate that the explosive responsible for the April 7, 2008 attack in Sadr City was an EFP traceable to Iran and its proxies." *Stearns*, 633 F. Supp. 3d at 318. This Court also specifically found that the blast killed Timothy Smith. *Id. See also Karcher v. Islamic Republic of Iran*, No. 16-cv-232-CKK, 2021 WL 133507, at *52–53 (D.D.C. Jan. 14, 2021) (finding Iran responsible for the April 7, 2008 attack that killed Timothy Smith). Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

d.  As a result of the April 7, 2008 Terrorist Attack, Ha-Nul Lee sustained significant injuries, including a TBI and PTSD.

e.  Because of these injuries, Ha-Nul Lee is entitled to past and future economic and noneconomic damages. Specifically, damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

### 3.  The March 18, 2004 Terrorist Attack – Al Asad, Iraq
### Plaintiff: Daryll Tinson Family

a.  Plaintiff Daryll Tinson is a citizen of the United States and is domiciled in the State of Georgia.

b.  Plaintiff Mary Suttles is a citizen of the United States and is domiciled in the State of Georgia. She is the mother of Daryll Tinson.

c.  Plaintiff Gerald Tinson is a citizen of the United States and is domiciled in the State of Georgia. He is the father of Daryll Tinson.

d.  Plaintiff Derrick Tinson is a United States citizen domiciled in the State of Georgia. He is the brother of Daryll Tinson.

e.  Plaintiff Daniel Tinson is a United States citizen domiciled in the State of Georgia. He is the brother of Daryll Tinson.

f.  Daryll Tinson was a Corporal in the United States Marine Corps with the Marine Aviation Logistics Squadron 16 forward out of Miramar, California. He was deployed to Al Asad, Iraq. On March 18, 2004, he was exposed to mortar round attack to his Forward Operating Base (FOB) in Al Asad, Iraq. Cpl. Andrew Brownfield was killed in action (KIA) in the March 18, 2004 mortar attack on the Al Asad Air Base. Cpl. Tinson was injured but survived the Terrorist Attack.

g.  The March 18, 2004 Terrorist Attack against Daryll Tinson constitutes an act of extrajudicial killing because it resulted in the death of Andrew Brownfield. 28 U.S.C § 1605A(a)(1). Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

h.  As a result of the March 18, 2004 Terrorist Attack, Daryll Tinson sustained significant injuries, including PTSD, tinnitus, and a TBI.

i.  Because of these injuries, Daryll Tinson is entitled to past and future economic and noneconomic damages. Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity. Additionally, Mary Suttles, Gerald Tinson, Derrick Tinson, and Daniel Tinson incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Daryll Tinson on March 18, 2004.

### 4.  The April 23, 2007 Terrorist Attack - Baghdad, Iraq
### Plaintiff: Jason Ludovico Family

a.  Plaintiff Jason Ludovico is a citizen of the United States and is domiciled in the State of North Carolina.

b.  Jason Ludovico enlisted in the United States Marine Corps and became a Staff Sergeant in the 2nd Combat Engineer Battalion out of Camp Lejeune, North Carolina. He was deployed to Fallujah, Iraq. On April 23, 2007, Ludovico was traveling in a convoy of six vehicles in AL Anbar province, Iraq, to locate and detonate IEDs when the convoy was attacked. The armored vehicle in front of Ludovico's Humvee was hit with a large IED, which penetrated its armor. A second explosive struck Ludovico's Humvee in a coordinated attack. Shrapnel penetrated Ludovico's vehicle. Lance Corporal Dale Peterson and Lance Corporal Johnathan Kirk were both KIA as a result of wounds sustained in the April 23, 2007 attack. Sgt. Ludovico was injured but survived the Terrorist Attack.

c.  The April 23, 2007 Terrorist Attack against Jason Ludovico constitutes an act of extrajudicial killing because it resulted in the deaths of Lance Corporal Dale Peterson and Lance Corporal Jonathan Kirk. 28 U.S.C § 1605A(a)(1). Upon information and belief, Iran, including its

officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

d.  As a result of April 23, 2007 Terrorist Attack, Jason Ludovico sustained significant injuries, including a TBI and PTSD.

e.  Because of these injuries, Jason Ludovico is entitled to past and future economic and noneconomic damages. Specifically, damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

### 5.  The March 26, 2005 Terrorist Attack - Baghdad, Iraq
### Plaintiff: Broderick Mosley Family

a.  Plaintiff Broderick Mosley is a citizen of the United States and is domiciled in the State of Texas.

b.  Plaintiff Mary Mosley is a citizen of the United States and is domiciled in the State of Louisiana. She is the mother of Broderick Mosley.

c.  Plaintiff Willie Smith is a citizen of the United States and is domiciled in the State of Louisiana. He is the father of Broderick Mosley.

d.  Plaintiff Autumn Mosley is a citizen of the United States and is domiciled in the State of Texas. She is the daughter of Broderick Mosley.

e.  Plaintiff Broshayla Mosley is a citizen of the United States and is domiciled in the State of Texas. She is the daughter of Broderick Mosley.

f.  Broderick Mosley enlisted in the United States Army, Louisiana State National Guard, as a Sergeant in the Five Hundred Sixty First Military Police Company out of Fort Turnbull, Louisiana. He was deployed to Kuwait and Iraq. On March 26, 2005, Sgt. Mosley was providing security in the outskirts of Baghdad near his FOB. Sgt. Mosley was in a four-vehicle patrol convoy outside of the base waiting to begin an escort mission. Suddenly, a suicide bomber attacked Sgt. Mosley's vehicle, detonating a Vehicle Borne Improvised Explosive Device (VBIED) in Sgt. Mosley's proximity. Sgt. Lee Godbolt and Sgt. Isiah Sinclair were KIA in the blast. As a result, Sgt. Mosley was medevacked to Landstuhl, Germany for emergency medical treatment. Sgt. Mosley was injured but survived the Terrorist Attack and was awarded a Purple Heart and a Combat Action Badge.

g.  The March 26, 2005 Terrorist Attack against Broderick Mosley constitutes an act of extrajudicial killing because it resulted in the deaths of Sgt. Lee Godbolt and Sgt. Isiah Sinclair. 28 U.S.C § 1605A(a)(1). Upon information and belief, Iran, including its officials, employees,

and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

h. As a result of the March 26, 2005 Terrorist Attack, Broderick Mosley sustained significant injuries, including third degree burns on his left hand requiring skin grafts, a shattered left elbow, facial burns, a spinal injury, severe PTSD and a TBI.

i. Because of these injuries, Broderick Mosley is entitled to past and future economic and noneconomic damages. Specifically, damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity. Additionally, Mary Mosley, Willie Smith, Autumn Mosley, and Broshayla Mosley incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Broderick Mosley on March 26, 2005.

### 6. The July 18, 2007 Terrorist Attack - Adhamiyah, Iraq
### Plaintiff: Derrian Hamilton Family

a. Plaintiff Derrian Hamilton is a citizen of the United States and is domiciled in the State of Oklahoma.

b. Plaintiff Patricia Latimer is a citizen of the United States and is domiciled in the State of Michigan. She is the mother of Derrian Hamilton.

c. Derrian Hamilton enlisted in the United States Army and served as Staff Sergeant in the 1st Infantry Division, 26 Infantry Battalion. He was deployed to Iraq. On July 18, 2007, Hamilton was in a convoy of eight vehicles on a recognizance mission in northern Adhamiyah, Iraq. He was the gunner in an up-armored Humvee equipped with Rhino and a Duke system to neutralize remote control detonation of IEDs. While traveling on Main Supply Route Dover, a 6-array EFP triggered by a pressure sensor erupted from a refrigerator placed amongst trash approximately 12 feet from the road. The copper plates used in the EFP were fashioned to fit inside a one-gallon paint can. The blast penetrated into the Humvee's armor and threw Sgt. Hamilton from the vehicle, and he lost consciousness. The up-armored Humvee flipped and caught fire. When Sgt. Hamilton regained consciousness, he could hear screams and banging from inside of the Humvee followed by silence. Spc. Richard Gilmore, III, Spc. Zachary Clouser, Spc. Daniel Gomez, and Spc. Luis Guitierrez-Rosales were KIA as a result of the EFP blast. Derrian Hamilton was injured but survived the Terrorist Attack.

d. The July 18, 2007 Terrorist Attack against Derrian Hamilton constitutes an act of extrajudicial killing because it resulted in the deaths of Spc. Richard Gilmore, III, Spc. Zachary Clouser, Spc. Daniel Gomez, and Spc. Luis Guitierrez-Rosales. 28 U.S.C § 1605A(a)(1). Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but

not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

e.   As a result of the July 18, 2007 Terrorist Attack, Derrian Hamilton sustained significant injuries, including injuries to his left and right lower extremities, spinal injuries, a TBI, and PTSD.

f.   Because of these injuries, Derrian Hamilton is entitled to past and future economic and noneconomic damages. Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity. Additionally, Patricia Latimer incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Derrian Hamilton on July 18, 2007.

## 7.   The November 10, 2004 Terrorist Attack - Yathrib, Iraq
### Plaintiff: Adam Henson Family

a.   Plaintiff Adam Henson is a citizen of the United States and is domiciled in the State of Montana.

b.   Plaintiff Amanda Marsarskiy is a citizen of the United States and is domiciled in the State of California.  She is the daughter of Adam Henson.

c.   Adam Henson enlisted in the United States Army California National Guard as part of the 81st Brigade Combat Team, 579th Engineer Battalion, Alpha Company out of Petaluma, California and attached to 81st Brigade Combat Team, Task Force Tacoma, 898th Engineer Battalion, Alpha Company.  Sgt. Henson was deployed to Iraq.  On November 10, 2004, Sgt. Henson was the truck commander of the lead up-armored Humvee in a six-vehicle convoy.  His convoy had been conducting combat operations in Yathrib, Iraq and was returning to Logistics Support Area Anaconda. Approximately 1000 kilometers from the entrance gate to Logistics Support Area Anaconda, Sgt. Henson's vehicle was attacked with a remote-detonated, copper-lined EFP.  The EFP blast penetrated the up-armored Humvee directly under the driver's seat.  The attack instantly killed the driver, Sgt. Michael Ottolini, and traumatically amputated both of the gunner's legs.  Adam Henson survived the Terrorist Attack and was awarded a Purple Heart.

d.   The November 10, 2004 Terrorist Attack against Adam Henson constitutes an act of extrajudicial killing because it caused the death of Sgt. Michael Ottolini. 28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to tactical training and furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

e.  As a result of the November 10, 2004 Terrorist Attack, Adam Henson sustained significant injuries, including rib injuries, back injury, migraines, shrapnel wounds to his elbow, a left hand fracture, a TBI, and PTSD.

f.  Because of these injuries, Adam Henson is entitled to past and future economic and noneconomic damages. Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity. Additionally, Amanda Marsarskiy incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Adam Henson on November 10, 2004.

## 8.  The July 31, 2007 Terrorist Attack - Baghdad, Iraq
### Plaintiff: Brian Edington Family

a.  Plaintiff Brian Edington is a citizen of the United States and is domiciled in the State of Indiana.

b.  Plaintiff Vicki Edington is a citizen of the United States and is domiciled in the State of Indiana. She is the wife of Brian Edington.

c.  Plaintiff Marsha Herd is a citizen of the United States and is domiciled in the State of Indiana. She is the mother of Brian Edington.

d.  Plaintiff Raymond Herd is a citizen of the United States and is domiciled in the State of Indiana. He is the father of Brian Edington.

e.  Plaintiff Derek Fox is a citizen of the United States and is domiciled in the State of Indiana. He is the son of Brian Edington.

f.  Brian Edington enlisted in the United States Army and served as a Specialist in the Bravo Company, Third Infantry Battalion, Second Infantry Division out of Fort Lewis, Washington. He was deployed to Baghdad, Iraq.  On July 31, 2007, Spc. Edington was traveling in an armored Stryker equipped with added IED protection in a convoy of eight vehicles on a patrol mission in Baghdad.  An EFP was fired at the convoy and penetrated one of the armored vehicles.  Spc. Zachariah Gonzalez, Spc. Charles Heinlein Jr., and Spc. Alfred Jairala were KIA in the attack. Edington survived the Terrorist Attack, but was injured and treated at the FOB.

g.  The July 31, 2007 Terrorist Attack against Brian Edington constitutes an act of extrajudicial killing because it caused the deaths of Spc. Zachariah Gonzalez, Spc. Charles Heinlein Jr., and Spc. Alfred Jairala.  28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

h.  As a result of the July 31, 2007 Terrorist Attack, Brian Edington sustained significant injuries, including tinnitus, a TBI, and PTSD causing migraine headaches.

i.  Because of these injuries, Brian Edington is entitled to past and future economic and noneconomic damages. Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity. Additionally, Vicki Edington, Marsha Herd, Raymond Herd, and Derek Fox incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Brian Edington on July 31, 2007.

### 9.  November 25, 2008 Terrorist Attack – Bi'ja, Iraq
### Plaintiff: Marc Shelton Family

a.  Plaintiff Marc Shelton is a citizen of the United States and is domiciled in the State of California.

b.  Plaintiff Yukiko Shelton is a citizen of the United States and is domiciled in the District of Columbia. She was Marc Shelton's wife at the time of the attack.

c.  Plaintiff Linda Penn is a citizen of the United States and is domiciled in the State of California. She is the mother of Marc Shelton.

d.  Plaintiff Aiko Shelton is a citizen of the United States and is domiciled in the State of California. She is the daughter of Marc Shelton.

e.  Plaintiff Tawn-Kai Shelton is a citizen of the United States and is domiciled in the State of California. He is the son of Marc Shelton.

f.  Marc Shelton enlisted in the United States Marine Corps and served as a Chief Warrant Officer in the Communications Company, First Marines Division assigned to the Second Battalion, Eleventh Marines, out of Camp Pendleton, California, which was serving as a provisional civil affairs unit in Bi'ja, Iraq. On November 25, 2008, CWO Shelton was at an Iraqi Military Compound in Bi'ja assisting the local Muqtar with a humanitarian aid mission. Numerous members of the United States Army, United States Marine Corps, Iraqi Army and Iraqi Police were providing security. After CWO Shelton greeted the Muqtar and walked past the first Iraqi soldier stationed above the compound entry point, CWO Shelton was shot three times in his back. Small arms fire ensued all over the compound. CWO Shelton tried to return fire but was shot twice more in his hip and in his chest. As a result, CWO Shelton was immediately evacuated and provided medical attention at the Combat Aide Station at the Combat Outpost in Bi'ja. He was medevacked to Mosul where he underwent surgery and received medical treatment for the next four months. Marine Captain Warren A. Frank and Master Sergeant Anthony Davis were KIA during the attack. Marc Shelton was seriously injured but survived the coordinated Terrorist Attack and was awarded a Purple Heart.

g. The November 25, 2008 Terrorist Attack against Marc Shelton constitutes an act of extrajudicial killing because it caused the deaths of Captain Warren A. Frank and Master Sergeant Anthony Davis. 28 U.S.C § 1605A(a)(1). Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

h. As a result of the November 25, 2008 Terrorist Attack, Marc Shelton sustained significant injuries, including multiple scars from gunshot wounds, a concussion, bilateral hearing loss, bilateral tinnitus, a TBI, and PTSD.

i. Because of these injuries, Marc Shelton is entitled to past and future economic and noneconomic damages. Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity. Additionally, Yukiko Shelton, Linda Penn, Aiko Shelton, and Tawn-Kai Shelton incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Marc Shelton on November 25, 2008.

## 10. The August 20, 2006 Terrorist Attack – Rawah, Iraq
### Plaintiff: Ryan Majewski Family

a. Plaintiff Ryan Majewski is a citizen of the United States and is domiciled in the State of Illinois.

b. Plaintiff Karen Majewski is a citizen of the United States and is domiciled in the State of Illinois.  She is the mother of Ryan Majewski.

c. Plaintiff Samantha Carney is a citizen of the United States and is domiciled in the State of Illinois.  She is the sister of Ryan Majewski.

d. Ryan Majewski enlisted in the United States Marines and served as a Lance Corporal in the 3rd Light Armored Reconnaissance Battalion out of Twenty-Nine Palms, California.  He was deployed to Baghdad, Iraq.  Lance Corporal Majewski was traveling in a convoy of light armored vehicles and armored Humvees during a combat operation in the Al Anbar province. A pressure-triggered IED exploded into the convoy.  Chadwick Kenyon, Randy Newman, and Adam Galvez were KIA in the blast.  Lance Corporal Majewski was injured but survived the Terrorist Attack.

e. The August 20, 2006 Terrorist Attack against Ryan Majewski constitutes an act of extrajudicial killing because it caused the deaths of Chadwick Kenyon, Randy Newman, and Adam Galvez. 28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to tactical training and furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

f.   As a result of the August 20, 2006 Terrorist Attack, Ryan Majewski sustained significant injuries, including a concussion, post-concussive syndrome, a TBI, and severe PTSD.

g.   Because of these injuries, Ryan Majewski is entitled to past and future economic and noneconomic damages.  Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.  Additionally, Karen Majewski and Samantha Carney incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Ryan Majewski on August 20, 2006.

## 11. The November 2, 2003 Terrorist Attack - Fallujah, Iraq
### Plaintiff: Andrew Kenyon Family

a.   Plaintiff Andrew Kenyon is a citizen of the United States and is domiciled in the State of Florida.

b.   Andrew Kenyon enlisted in the United States Army and served in the 3rd Armored Cavalry Regiment out of Fort Carson, Colorado.  He was deployed to Baghdad, Iraq.  On November 2, 2003, Kenyon was traveling to Baghdad International Airport via a CH-47 Chinook helicopter when it was shot down with a surface-to-air missile near Fallujah.  As a result, 15 soldiers were KIA. Kenyon was injured and immediately medevacked to Landstuhl, Germany.   Andrew Kenyon was injured but survived the Terrorist Attack, and he was awarded a Purple Heart.

c.   The November 2, 2003 Terrorist Attack against Andrew Kenyon constitutes an act of extrajudicial killing because it caused the deaths of Sgt. Daniel Bader, Sgt. Ernest Bucklew, Sgt. Steven Conover, and a dozen other deaths. 28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

d.   As a result of the November 2, 2003 Terrorist Attack, Andrew Kenyon sustained significant injuries, including a fractured femur, broken left arm, fractured pelvis, collapsed lung, broken right hand, broken left foot, spinal fractures, a TBI, and severe PTSD.

e.   Because of these injuries, Andrew Kenyon is entitled to past and future economic and noneconomic damages. Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

## 12. The July 10, 2011 Terrorist Attack - Amarah, Iraq
### Plaintiff: Cuong Le

a.   Plaintiff Cuong Le is a citizen of the United States and is domiciled in the State of Kansas.

b. Cuong Le enlisted in the United States Army and served as a Sergeant First Class in the 8th Cavalry Regiment, 3rd Brigade Combat Team, 1st Cavalry Division out of Fort Hood, Texas. He was deployed to Iraq.  In the early morning of July 10, 2011, Contingency Operating Base Garry Owen in Amarah, Iraq came under attack and was fired upon by 21 rockets.  Steven Talamantez was KIA by the indirect rocket fire.  Sgt. Le was hit by shrapnel and sustained a concussion but continued to assist his fellow soldiers to safety.  He was injured and received a Medal of Commendation for his valor, but he survived the Terrorist Attack.

c. The July 10, 2011 Terrorist Attack against Cuong Le constitutes an act of extrajudicial killing because it caused the death of Steven Talamantez. 28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

d. As a result of the July 10, 2011 Terrorist Attack, Cuong Le sustained significant injuries, including shrapnel wounds, a TBI, and PTSD with migraines.

e. Because of these injuries, Cuong Le is entitled to past and future economic and noneconomic damages.  Specifically, damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

### 13. <u>The November 7, 2007 Terrorist Attack – Arab Jabour, Iraq</u>
### Plaintiff: Adam Krouse Family

a. Plaintiff Adam Krouse is a citizen of the United States and is domiciled in the State of Texas.

b. Plaintiff Raeshaundra Krouse is a United States citizen domiciled in the State of Texas.  She is the wife of Adam Krouse.

c. Plaintiff Bryce Krouse is a United States citizen domiciled in the State of Texas.  He is the son of Adam Krouse.

d. Plaintiff Isabella Krouse is a United States citizen domiciled in the State of Texas.  She is the daughter of Adam Krouse.

e. Adam Krouse enlisted in the United States Army and served as a specialist of the 1st Battalion, 30th Infantry Regiment, 3rd Infantry Division out of Fort Stewart, Georgia. He was deployed to Iraq.  On November 7, 2007, around 1700, Spc. Krouse was conducting a foot patrol mission in Arab Jabour, Iraq to capture a high value target when a fellow soldier on the mission stepped on a pressure plate triggering an IED. Lui Tumanuvao was KIA by the blast and Spc. Krouse sustained shrapnel wounds and multiple broken bones.  As a result, Spc. Krouse was immediately medevacked to Baghdad then transported to Landstuhl Germany for further

medical attention.  Adam Krouse was injured but survived the Terrorist Attack and was awarded a Purple Heart.

f.   The November 7, 2007 Terrorist Attack against Adam Krouse constitutes an act of extrajudicial killing because it caused the death of Lui Tumanuvao.  28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

g.   As a result of the November 7, 2007 Terrorist Attack, Adam Krouse sustained significant injuries, including numerous fractures, hearing loss, tinnitus, shrapnel wounds, PTSD, and a TBI.

h.   Because of these injuries, Adam Krouse is entitled to past and future economic and noneconomic damages.  Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.  Additionally, Raeshaundra Krouse, Bryce Krouse, and Isabella Krouse incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Adam Krouse on November 7, 2007.

### 14. <u>The June 18, 2004 Terrorist Attack – Log Base Seitz, Baghdad, Iraq</u>
### Plaintiff: Alexander Murphy Family

a.   Plaintiff Alexander Antonio Murphy is a citizen of the United States and is domiciled in the State of Missouri.

b.   Plaintiff Lee Emerson Murphy is a citizen of the United States and is domiciled in the State of South Dakota.  He is the father of Alexander Murphy.

c.   Plaintiff Aaron Anthony Murphy is a citizen of the United States and is domiciled in the State of Missouri.  He is the brother of Alexander Murphy.

d.   Plaintiff Madison Rose Murphy is a citizen of the United States and is domiciled in the State of Kansas.  She is the sister of Alexander Murphy.

e.   Alexander Antonio Murphy enlisted in the United States Army, Kansas City MEPS, in Kansas City, Missouri on July 26, 2002.  He was deployed to Kuwait and Iraq from February 27, 2004, through March 01, 2005.  He was an Spc., part of the 308th Quartermaster Company out of Washington, Iowa, stationed at Log Base Seitz, Baghdad, Iraq.  Spc. Murphy served as part of the motor brigade and his duties consisted of fuel operations, convoy security, and base security.

f.  On June 18, 2004, Spc. Murphy had just taken his protective gear off for a short break when he heard the start of an attack on the base. As he went to the door of his tent to assess the threat, a mortar dropped right in front of him and detonated. Everything instantly went black, and he was knocked unconscious. Spc. Murphy survived but was injured in the Terrorist Attack. He woke up the next morning in the Baghdad Hospital.

g.  Spc. Murphy suffered major injuries and had the option to return home, but remained on his deployment because his twin brother, Aaron Murphy, was also in the 308th and he could not leave him there. Spc. Murphy was awarded the Purple Heart and Army Commendation Medal.

h.  There was one death in the attack. SPC Thai Vue, of Willows California, who was assigned to the 127th Military Police Company, 709th Military Police Battalion, 18th Military Police Brigade, V Corps, Hanau Germany, was killed when a mortar round hit the motor pool where he was working at the time of the Terrorist Attack.

i.  The June 18, 2004, Terrorist Attack against Alexander Murphy constitutes an act of extrajudicial killing because it resulted in the deaths of Spc. Thai Vue.  28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

j.  As a result of the June 18, 2004, Terrorist Attack, Alexander Murphy sustained significant injuries, including a fractured skull and jaw, severe PTSD, a TBI, severe depression, severe anxiety, sleep issues, nightmares, and severe suicidal attempts and thoughts.

k.  Because of these injuries, Alexander Murphy is entitled to past and future economic and noneconomic damages.  Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.  Additionally, Lee Murphy, Aaron Murphy, and Madison Murphy incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Alexander Murphy on June 18, 2004.

## 15. The June 20, 2007, Terrorist Attack –Baghdad, Iraq
### Plaintiff: Phillip Yerou

a.  Plaintiff Phillip Francoispierre Yerou is a citizen of the United States and is domiciled in the State of Florida.

b.  Phillip Francoispierre Yerou enlisted in the United States Army.  At the time of the attack, he was a Private First Class (PFC) with the B Company, 1st Battalion, 64th Armored Regiment, 3rd Infantry Division out of Fort Stewart, Georgia.  He was deployed to Iraq from May 13, 2007, through July 03, 2008.

c.  On the night of June 20, 2007, PFC Yerou was conducting a routine presence patrol in Baghdad, Iraq. PFC Yerou was the gunner in the lead vehicle of a four-vehicle convoy when his Rhino- and Duke System-equipped Humvee was struck by an IED that was place in the middle of the road that detonated after his vehicle had passed over it.

d.  The explosion caused serious injuries to PFC Yerou and killed the following four occupants of the Humvee directly behind his Humvee: PFC David J. Bentz, III, CPL Joe G. Charfauros, Jr., SSG Darren P. Hubbell, Maj. Sid W. Brookshire.

e.  PFC Yerou was awarded the Combat Infantry Badge and the Global Ward on Terrorism service Medal.

f.  The June 20, 2007, Terrorist Attack against PFC Phillip Yerou constitutes an act of extrajudicial killing because it resulted in the deaths of the four named soldiers above. 28 U.S.C § 1605A(a)(1). Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

g.  As a result of the June 20, 2007, Terrorist Attack, PFC Phillip Yerou sustained significant injuries, including a head wound laceration to the top of his scalp with resulting scar, migraines, severe PTSD, a TBI, depression, anxiety, panic attacks, sleep disturbances, and nightmares.

h.  Because of these injuries, PFC Phillip Yerou is entitled to past and future economic and noneconomic damages. Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

### 16. The November 08, 2004 Terrorist Attack - Baghdad, Iraq
### Plaintiff: Nathan Gray

a.  Plaintiff Nathan Eugene Gray is a citizen of the United States and is domiciled in the State of Kansas.

b.  Nathan Gray enlisted in the United States Army National Guard, part of the 130th Field Artillery out of Fort Riley, Kansas. He was ordered to active duty in support of Operation Iraqi Freedom. He was deployed to Iraq from December 18, 2003, through April 06, 2005.

c.  On November 08, 2004, Specialist Gray was serving as the Chase Vehicle Rear Gunner responsible for manning the Squad Automatic Weapon (SAW) while assigned as Personal Security Detail (PSD), Iraq Survey Group (ISG), Baghdad, Iraq. He provided observation for the rear of the PSD convoy. On the morning of November 08, 2004, the PSD received a time-sensitive mission to provide security for the highest ranking senior executive member of ISG. Shortly after leaving Camp Slayer while traveling along Route Irish, one of the most

treacherous and heavily attacked routes in Iraq, a vehicle approached the convoy from an adjoining on-ramp at a very fast speed and it continued to gain speed as it approached the convoy. Without hesitation and with complete disregard for their own personal safety, the chase vehicle with Specialist Gray fearlessly positioned their vehicle between the principal that they were protecting and a deadly and determined enemy, allowing the principal's vehicle to evade the threat. As Specialist Gray's vehicle and the threat vehicle were within inches of colliding, the driver of the enemy vehicle detonated the VBIED hidden within his vehicle. Specialist Gray's gallant, selfless and voluntary actions in the face of great danger, which resulted in severe and life-threatening wounds, was directly responsible for the saving of the lives of four others in the convoy. Unfortunately, this attack did claim the lives of two other in his convoy, Army Staff Sgt. Clinton L. Wisdom and SPC Don A. Clary.

d.  As a result, Specialist Gray was medevacked to the field hospital in Baghdad, then stabilized in Kuwait. Next, he was flown to Landstuhl, Germany for emergency medical treatment. From Germany Specialist Gray was transported to the Walter Reed Medical Center and finally to the Burn Center for treatment of all of his significant injuries. Specialist Gray was injured but survived the Terrorist Attack and was awarded a Purple Heart, Combat Action Badge, and The Bronze Star Medal with Valor.

e.  The November 08, 2004, Terrorist Attack against Specialist Gray constitutes an act of extrajudicial killing because it resulted in the deaths of Army Staff Sgt. Clinton L. Wisdom and SPC Don A. Clary. 28 U.S.C § 1605A(a)(1). Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

f.  As a result of the November 08, 2004, Terrorist Attack, Specialist Gray sustained significant injuries, including shrapnel wounds, severe PTSD, severe concussion, a TBI, three (3) broken ribs, a punctured lung, three (3) broken vertebrae in his neck and two (2) broken vertebrae in his back, severe burns on his face, hip, and hands (which required treatment at the burn center as noted above), broken left hand, and a shattered right ankle.

g.  Because of these injuries, Specialist Nathan Gray is entitled to past and future economic and noneconomic damages. Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

### 17. The August 15, 2007 Terrorist Attack – Camp Taji in Baghdad, Iraq
### Plaintiff: Anthony Manalo

a.  Plaintiff Anthony Hernandez Manalo is a citizen of the United States and is domiciled in the State of Washington.

b.  Anthony Manalo enlisted in the United States Army, as a Sgt. 1st Class, as part of the 2-319 Airborne Field Artillery Regiment, 82nd Airborne Division out of Fort Bragg, North Carolina. He served in the Army from September 04, 1990, to January 31, 2012.  He served two tours in Iraq.  The Attack that is the subject of this complaint occurred during his deployment to Iraq from January 02, 2007, through March 19, 2008.

c.  On August 15, 2007, while Sgt. 1st Class Manalo was sleeping in his chu, two rockets exploded 25 and 30 yards from Camp Taji in Baghdad, Iraq.  The concussion of the blast knocked him unconscious.  When he awoke, he was under the bed and had to be rescued by the firefighters as he was trapped inside.  Anthony Manalo survived this attack and was awarded a Combat Action Badge.

d.  The August 15, 2007, Terrorist Attack against Sgt. 1st Class Manalo constitutes an act of extrajudicial killing because it resulted in the deaths of Sgt. Princess C. Samuels and Spc. Zandra T. Walker.  28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

e.  As a result of the August 15, 2007, Terrorist Attack, Sgt. 1st Class Manalo sustained significant injuries, including a concussion, severe PTSD and a TBI.

f.  Because of these injuries, Anthony Manalo is entitled to past and future economic and noneconomic damages. Specifically, damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

## 18. <u>The November 30, 2007, Terrorist Attack - Baqubah, Iraq</u>
### Plaintiff: Ryan Payne

a.  Plaintiff Ryan Benjamin Payne is a citizen of the United States and is domiciled in the State of West Virginia.

b.  Ryan Payne enlisted in the United States Army, as part of the 5-71st Military Police Company out of Fort Lewis, Washington.  He served from July 18, 2002, through July 31, 2022.  During that time served 11 years, 9 months in the military police and 7 years, 10 months as an CID Special Agent.  SSG Ryan Payne was deployed to Iraq November 05, 2006, through January 21, 2008.

c.  On November 30, 2007, between 1300 and 1500 hours, SSG Ryan Payne was in a convoy of three vehicles.  He was the front passenger of an M1117 Armored Security Vehicle.  The M1117 Armored Security Vehicle was equipped with Rhino technology.  His convoy was heading towards FOB Warhorse when they were attacked with a six-array EFP.  Payne's convoy had just completed their mission for the day—training with the Iraqi police at the police

station in Baqubah—and were beginning their travel back to FOB Warhorse when the explosive device hit the right side of his vehicle, second in the convoy, causing the vehicle to roll over.  SSG Ryan Payne was knocked unconscious in the attack, and it killed the Gunner, Sgt. Blair W. Emery.

d.  After help arrived at the scene of the attack, SSG Ryan Payne was immediately treated at the FOB Warhorse Medical Center.  Ryan Payne survived the Terrorist Attack and was awarded a Purple Heart Award and a Combat Action Badge.

e.  The November 30, 2007, Terrorist Attack against SSG Ryan Payne constitutes an act of extrajudicial killing because it resulted in the death of gunner, Sgt. Blair W. Emery.  28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

f.  As a result of the November 30, 2007, Terrorist Attack, SSG Ryan Payne sustained significant injuries, including laceration on left leg, muscle spasms in his back, tinnitus, severe PTSD, and a TBI.

g.  Because of these injuries, SSG Ryan Payne is entitled to past and future economic and noneconomic damages.  Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

### 19. <u>The May 17, 2006, Terrorist Attack - Fallujah, Iraq</u>
### Plaintiff: Nigel Max Edge (fka Sean William Debevoise)

a.  Plaintiff Nigel Max Edge (fka Sean William Debevoise) is a citizen of the United States and is domiciled in the State of Noth Carolina.

b.  Nigel Max Edge was enlisted a Corporal in the United States Marine Corps as part of the 2nd Recon Battalion out of Camp Lejeune, North Carolina.

c.  On the night of May 17, 2006, Sgt. Nigel Max Edge and his team went out on a raid.  While trying to secure a warehouse, Sgt. Edge was shot a twice.  Once Sgt. Edge was outside of the warehouse and taking cover on a wall, a suicide bomber detonated his bomb causing head injuries to Sgt. Edge.

d.  As a result, Sgt. Edge was medevacked to Germany for emergency treatment including multiple surgeries, chest bilateral tubing with mechanical ventilation, cranial decompression, and reconstruction of skull defect before he returned to home to the United States for further medical care.  Sgt. Edge survived the Terrorist Attack and was awarded the Purple heart.

e.  The May 17, 2006, Terrorist Attack against Sgt. Edge constitutes an act of extrajudicial killing because it resulted in the death of Navy Hospital Corpsman 3rd Class Lee Hamilton Deal. 28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

f.  As a result of the May 17, 2006, Terrorist Attack, Sgt. Edge sustained significant injuries, including left shoulder injuries, right leg injuries, lower pelvic region injuries, shrapnel wounds with fragment in his right elbow, hemiparesis - left leg / left knee condition, residuals of gun shot wounds to the head and left leg with permanent scarring, nerve damage with left leg paralysis, severe PTSD, and a TBI.

g.  Because of these injuries, Sgt. Nigel Max Edge is entitled to past and future economic and noneconomic damages.  Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

## 20. The September 18, 2007, Terrorist Attack - Muqdadiyah, Iraq
### Plaintiff: Adam Tuculet

a.  Plaintiff Adam Dale Tuculet is a citizen of the United States and is domiciled in the State of California.

b.  Adam Tuculet enlisted in the United States Army, as part of the 2nd Infantry Division, 23rd Infantry Regiment, 4th Brigade out of Fort Lewis, Washington.  He served from November 09, 2004, through September 03, 2008. He was deployed to Iraq from April 09, 2007, through June 05, 2008.

c.  On September 18, 2007, Sgt. Adam Tuculet's unit was assigned to clearing the city when they were hit by multiple IEDs as well as a suicide bomber that jumped out from hiding and detonated his bomb.  The attack resulted in the deaths of three in his squad and maiming/injuring the rest. The three team members that died were Sgt. Joseph N. Laundry, III, Sgt. Nicholas P. Olson, and Sgt. Donald E. Valentine, III.

d.  Sgt. Tuculet was approximately 10 meters from the suicide bomber at the time of the explosion. The impact of the blast threw Sgt. Tuculet off his feet, flying over a stove, and he was knocked unconscious for the space of several minutes. Sgt. Tuculet was injured but survived the Terrorist Attack. Sgt. Tuculet was unable to sleep for 3 days following the Attack.

e.  Sgt. Tuculet survived the Terrorist Attack and was awarded the Army Commendation Medal of Value while engaged in two weeks of continued Combat and Stability Operations.  Sgt. Tuculet's medal notes that he took charge of his squad after it was devastated by the suicide bomb attack and led from the front until a new squad leader was assigned.

f.  The September 18, 2007, Terrorist Attack against Sgt. Adam Tuculet constitutes an act of extrajudicial killing because it resulted in the deaths of Sgt. Joseph N. Laundry, III, Sgt. Nicholas P. Olson, and Sgt. Donald E. Valentine, III.  28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

g.  As a result of the September 18, 2007, Terrorist Attack, Sgt. Tuculet sustained significant injuries, including the neck, back, right elbow, the loss of consciousness, hearing loss, tinnitus, insomnia, nightmares, migraines, anxiety, depression, concussion, post-traumatic amnesia, PTSD, and a TBI.

h.  Because of these injuries, Sgt. Adam Tuculet is entitled to past and future economic and noneconomic damages.  Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

### 21. May 3, 2006 Terrorist Attack - Kirkuk, Iraq
### Plaintiff: Jorge Manuel Ramirez Family

a.  Plaintiff Jorge Manuel Ramirez is a citizen of the United States and is domiciled in the State of Georgia.

b.  Plaintiff Dionia Ramirez is a citizen of the United States and is domiciled in the State of Georgia.  She is the daughter of Jorge Manuel Ramirez.

c.  Jorge Ramirez enlisted in the United States Army and served as a Sergeant in the 101st Airborne, 1st Brigade Combat Team out of Fort Campbell, Kentucky.  He was deployed to Mosul, Iraq.  On May 3, 2006, Sgt. Ramirez was traveling from Ramadi, Iraq to FOB Warrior in Kirkuk, Iraq in an up-armored Humvee as the second vehicle in a three-vehicle convoy.  While on Route Cherry, Sgt. Ramirez's vehicle was struck by an IED. The explosion penetrated through the bottom left wheel well and disabled the vehicle.  Sgt. Ramirez was injured but survived the Terrorist Attack.  But his squad leader, Army Pfc. Benjamin T. Zieske, was tragically KIA.

d.  The May 3, 2006 Terrorist Attack against Jorge Ramirez constitutes an act of extrajudicial killing because it caused the death of Pfc. Benjamin T. Zieske.  28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to tactical training and furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

e.  As a result of the May 3, 2006 Terrorist Attack, Jorge Ramirez sustained significant injuries, including Shrapnel wounds on left side of face, on his left arm, on his left foot; a severe head wound, PTSD, and a TBI.

f.  Because of these injuries, Jorge Ramirez is entitled to past and future economic and noneconomic damages. Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity. Additionally, Dionia Ramirez incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Jorge Ramirez on May 3, 2006.

## 22. The September 6-7, 2004 Terrorist Attack - Yusufiyah, Iraq
### Plaintiff: Dammon J. Sharp Family

a.  Plaintiff Dammon Sharp is a citizen of the United States and is domiciled in the State of North Carolina.

b.  Plaintiff Kathy Kleinik is a citizen of the United States and is domiciled in the State of Illinois. She is the mother of Dammon Sharp.

c.  Plaintiff Andrew Sharp is a citizen of the United States and is domiciled in the State of North Carolina. He is the son of Dammon Sharp.

d.  Plaintiff Gabriel Kuhlman is a citizen of the United States and is domiciled in the State of North Carolina. He is the brother of Dammon Sharp.

e.  Plaintiff Richard Ian Kuhlman is a citizen of the United States and is domiciled in the State of Illinois. He is the brother of Dammon Sharp.

f.  Dammon J. Sharp enlisted in the United Stated Army and served as a Sergeant in 18 Bravo Special Forces. He was deployed to Iraq. On September 6-7, 2004, Sgt. Sharp was part of a large, multi-vehicle convoy in an up-armored Humvee traveling into Yusufiyah in an area near Baghdad that was defended by insurgents. More than 50 heavily-armed, IRGC-trained insurgents attacked his convoy with small arms, RPGs, IEDs, and EFPs. An angled EFP was fired from the right side of the road and penetrated Sgt. Sharp's vehicle. The insurgent group continued the attack with a barrage of small arms fire and RPGs. In the complex attack, an IED was fired at a vehicle ahead of Sgt. Sharp's and Clarence Adams was KIA by the blast. Sgt. Sharp was injured but survived the complex attack, received treatment at the Combat Support Hospital in Baghdad, and was awarded a Purple Heart

g.  The September 6-7, 2004 Terrorist Attack against Dammon Sharp constitutes an act of extrajudicial killing because it caused the death of Clarence Adams. 28 U.S.C § 1605A(a)(1). Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but

not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

h.  As a result of the September 6-7, 2004 Terrorist Attack, Dammon Sharp sustained significant injuries, including a broken nose, fractured jaw, fractured pelvis, broken bones in his right leg and foot, fractures in his right arm and right hand, three broken ribs, a TBI, and PTSD.

i.  Because of these injuries, Dammon Sharp is entitled to past and future economic and noneconomic damages.  Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.  Additionally, Kathy Kleinik, Andrew Sharp, Gabriel Kuhlman, and Richard Ian Kuhlman incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Dammon Sharp on September 6-7, 2004.

## 23. The June 12-13, 2008 Terrorist Attack – Kadamiyah, Iraq
### Plaintiff: Jesse Sage

a.  Plaintiff Jesse Sage is a citizen of the United States and is domiciled in the State of Iowa.

b.  Plaintiff Dawn Sage is a citizen of the United States and is domiciled in the State of Iowa.  She is the mother of Jesse Sage.

c.  Plaintiff Ted Sage is a citizen of the United States and is domiciled in the State of Iowa.  He is the father of Jesse Sage.

d.  Plaintiff Molly Sage is a citizen of the United States and is domiciled in the State of Iowa.  She is the daughter of Jesse Sage.

e.  Plaintiff Rebekah Sage Keil is a citizen of the United States and is domiciled in the State of Iowa.  She is the sister of Jesse Sage.

f.  Plaintiff Rachel Sage Miller is a citizen of the United States and is domiciled in the State of Iowa.  She is the sister of Jesse Sage.

g.  Plaintiff Jonathan Sage is a citizen of the United States and is domiciled in the State of Iowa.  He is the brother of Jesse Sage.

h.  Plaintiff Benjamin Sage is a citizen of the United States and is domiciled in the State of Iowa.  He is the brother of Jesse Sage.

i.  Plaintiff Jacob Sage is a citizen of the United States and is domiciled in the State of Iowa.  He is the brother of Jesse Sage.

j.  Jesse Sage was a Sergeant in the United States Army assigned to 2nd Battalion, 327 Infantry Regiment part of 101st Airborne Division out of Fort Campbell, Kentucky.  He was deployed to Iraq.  On June 12-13, 2008, Sgt. Sage was the truck commander of an Armored Mine-Resistant Ambush Protected (MRAP) vehicle equipped with Rhino and other safeguarding devices in a four-vehicle conducting a reconnaissance mission south of Samara, Iraq, traveling to the Jazeera Desert from Forward Operating Base Brassfield Mora.  Near Kadamiyah, Iraq, his MRAP took a direct hit from a pressure-plate-triggered, 250 lb. IED.  While Sgt. Sage assisted other wounded soldiers, insurgents fired a second IED in the complex attack, killing a civilian contractor and wounding two other soldiers.  John David Aragon was KIA in the complex attack.  The impact of the second blast caused Sgt. Sage to lose consciousness.  Sgt. Sage was medevacked to the Air Force Trauma Center in Balad, Iraq then to Tikrit, Iraq and Landstuhl, Germany for further treatment before being transported back to Fort Campbell, Kentucky for more treatment and recovery.  Jesse Sage was injured but survived this Terrorist Attack and was awarded a Purple Heart.

k.  The June 12-13, 2008 Terrorist Attack against Jesse Sage constitutes an act of extrajudicial killing because it caused the death of John David Aragon and two civilian contractors.  28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

l.  As a result of the June 12-13, 2008 Terrorist Attack, Jesse Sage sustained significant injuries, including serious injuries to his left shoulder and right shoulder, a concession, a TBI, and PTSD.

m.  Because of these injuries, Jesse Sage is entitled to past and future economic and noneconomic damages.  Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.  Additionally, Dawn Sage, Ted Sage, Molly Sage, Rebekah Sage Keil, Rachel Sage Miller, Jonathan Sage, Benjamin Sage, and Jacob Sage incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Jesse Sage on June 12-13, 2008.

## 24. The April 17, 2004 Terrorist Attack - Dwaniyan, Iraq
### Plaintiff: Anthony Johnson Family

a.  Plaintiff Anthony Johnson is a citizen of the United States and is domiciled in the State of North Carolina.

b.  Plaintiff Patricia Johnson is a citizen of the United States and is domiciled in the State of North Carolina.  She is the wife of Anthony Johnson.

c.  Plaintiff Lindsey Johnson is a citizen of the United States and is domiciled in the State of New York.  She is the daughter of Anthony Johnson.

d.  Anthony Johnson was a Lieutenant Colonel in the United States Army National Guard.  He was deployed to Iraq.  On April 17, 2004, Mr. Johnson was in a convoy of about 20 vehicles. The convoy was traveling on MSR Tampa in Dwaniyan, Iraq near Camp Victory traveling to Camp Anaconda in Balad, Iraq when Lt. Col. Johnson was attacked with an IED. Sgt. Johnathan Hartman and Spc. Michael McGlothlin were tragically KIA in the blast.   Mr. Johnson was injured but survived the attack and received a Combat Action Badge.

e.  The April 17, 2004 Terrorist Attack against Anthony Johnson constitutes an act of extrajudicial killing because it caused the deaths of Sgt. Johnathan Hartman and Spc. Michael McGlothlin. 28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

f.  As a result of the April 17, 2004 Terrorist Attack, Anthony Johnson sustained significant injuries, including a TBI, tinnitus, and PTSD with chronic headaches.

g.  Because of these injuries, Anthony Johnson is entitled to past and future economic and noneconomic damages.  Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.  Additionally, Patricia Johnson and Lindsey Johnson incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Anthony Johnson on April 17, 2004.

## 25. The August 22, 2010 Terrorist Attack - Basrah, Iraq
### Plaintiff: Jesse Teeples

a.  Plaintiff Jesse Teeples is a citizen of the United States and is domiciled in the State of Utah.

b.  Jesse Teeples was a Petty Officer in the Navy assigned as an individual Augmentee with 5-5 Air Defense Artillery Regiment, out of Joint Base Lewis McCord, Washington.  He was deployed to Iraq.  On August 22, 2010, he was exposed to a rocket attack in Basrah, Iraq that resulted in a direct hit to Sergeant Brandin E. Maggart. Officer Teeples ran to render aid to his seriously injured friend, Sgt. Maggart, who later died in his arms and was KIA in the rocket attack.  Jesse Teeples was injured but survived this terrorist attack.

c.  The August 22, 2010 Terrorist Attack against Jesse Teeples constitutes an act of extrajudicial killing because it caused the death of Brandin Maggart.  28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but

not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

d.  As a result of the August 22, 2010 Terrorist Attack, Jesse Teeples sustained significant injuries, including PTSD and a TBI.

e.  Because of these injuries, Jesse Teeples is entitled to past and future economic and noneconomic damages.  Specifically, damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

## 26. The September 14, 2006 Terrorist Attack – Taji, Iraq
### Plaintiff: Robert Doss Family

a.  Plaintiff Robert Doss is a citizen of the United States and is domiciled in the State of Arizona.

b.  Robert Doss enlisted in the United States Army and served as a was a Specialist in B Company, 4th Battalion, 42nd FA, 1BE, 4th Infantry Division out of Fort Huachuca, Arizona.  On September 14, 2006, Spc. Doss was in a convoy that included three vehicles and dismounted soldiers.  He was the gunner of an up-armored Humvee equipped with Warlock and Rhino systems.  His convoy was conducting a night patrol in the Taji Market when they were attacked with a pressure plate IED triggered by a dismounted member of the convoy.  Spc. Russell Makowski was KIA in the blast.  Spc. Robert Doss was injured in the Terrorist Attack but survived.

c.  The September 14, 2006 Terrorist Attack against Robert Doss constitutes an act of extrajudicial killing because it caused the death of Russell Makowski.  28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to tactical training and furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

d.  As a result of the September 14, 2006 Terrorist Attack, Robert Doss sustained significant injuries, including a TBI and PTSD.

e.  Because of these injuries, Robert Doss is entitled to past and future economic and noneconomic damages.  Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

## 27. The April 26, 2004 Terrorist Attack - Fallujah, Iraq
### Plaintiff: Christopher Rodriguez Family

a.  Plaintiff Christopher Rodriguez is a citizen of the United States and is domiciled in the State of California.

b. Christopher Rodriguez enlisted in the United States Marine Corps and served as a Corporal in the 2nd Battalion, First Marines Division. On April 26, 2004, before sunrise, Cpl. Rodriguez was on patrol in Fallujah.  As Cpl. Rodriguez and his team entered a building, they came under small arms and grenade attack from a large number of highly-trained insurgents. While returning fire, an RPG landed near Cpl. Rodriguez's head, knocking him unconscious for about a minute.  Cpl. Aaron Austin was KIA in the complex attack during the intense machine gun and RPG fire.  Christopher Rodriguez was injured but survived the Terrorist Attack and was awarded a Purple Heart and a Combat Action Badge.

c. The April 26, 2004 Terrorist Attack against Christopher Rodriguez constitutes an act of extrajudicial killing because it caused the death of Aaron Austin. 28 U.S.C § 1605A(a)(1). Upon information and belief, Iran, including its officials, employees, and/or agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

d. As a result of the April 26, 2004 Terrorist Attack, Christopher Rodriguez sustained significant injuries, including shrapnel wounds, hearing loss in his left ear, a concussion, a TBI, and PTSD.

e. Because of these injuries, Christopher Rodriguez is entitled to past and future economic and noneconomic damages.  Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity.

## 28. The July 6, 2007 Terrorist Attack – Sadr City, Iraq
### Plaintiff: Thomas Graham Family

a. Plaintiff Thomas Graham is a citizen of the United States and is domiciled in the State of Colorado.

b. Plaintiff Jacquelin Hammell is a citizen of the United States and is domiciled in the State of Colorado. She is the mother of Thomas Graham.

c. Thomas Graham was an E4 in the United States Army and served in the 19 Kilo Abrams Tank Crew, 37 Cavalry.  He was deployed to Iraq.  On July 6, 2007, Mr. Graham was on patrol in the turret of an up-armored Humvee when they were attacked with an EFP, which penetrated the vehicle's armor.  Copper was found at the scene during after-blast investigation. Sgt. Gene Lamie and Pfc. LeRon Wilson were KIA in the blast.  As a result of the incident, Mr. Graham suffered bilateral knee amputations among other injuries, but he survived the Terrorist Attack and received a Purple Heart.

d. The July 6, 2007 Terrorist Attack against Thomas Graham constitutes an act of extrajudicial killing because it caused the deaths of Sgt. Gene Lamie and Pfc. LeRon Wilson.  28 U.S.C § 1605A(a)(1).  Upon information and belief, Iran, including its officials, employees, and/or

agents, provided material support or resources to the enemy forces who committed this attack—including but not limited to furnishing, supplying, and/or manufacturing all or part of the weapon(s) used in the attack.

e. As a result of the July 6, 2007 Terrorist Attack, Thomas Graham sustained significant injuries, including shrapnel wounds, bilateral amputation at the knee of both legs, a concussion, a TBI, and PTSD.

f. Because of these injuries, Thomas Graham is entitled to past and future economic and noneconomic damages. Specifically, he is entitled to damages for severe mental anguish, extreme physical pain and suffering, and past and future loss of earning capacity. Additionally, Jacquelin Hammell incurred solatium damages as a result of mental anguish, bereavement, grief, and loss of society and comfort suffered following the injuries sustained by Thomas Graham on July 6, 2007.

## IV.     LIABILITY & DAMAGES

### A.     Intentional Infliction of Emotional Distress (IIED).

4.1     This Court has previously held that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 202 F. Supp. 2d 78, 89 (D.D.C. 2002)). The material support and resources Defendant Iran, by and through the active support of the IRGC, IRGC-QF, and/or Hezbollah,[113] provided to the enemy forces responsible for the Terrorist Attacks at issue were instrumental in planning and ultimately executing these attacks. Therefore, this provision of material support constitutes extreme and outrageous conduct intended to cause Plaintiffs severe emotional distress.

---

[113] *See Cohen,* 238 F. Supp. 3d at 80-81 (concluding that "it is well established by courts in this district" that the IRGC is the functional equivalent of Iran and qualifies as a foreign state under the FSIA); *Valore,* 700 F. Supp. 2d at 74 (holding that Hezbollah acts at Iran's behest and is therefore an agent of Iran); *Karcher*, 396 F.Supp. 3d at 33 (holding that material support for a terrorist act must be provided by an Iranian "official, employee, or agent" for Iran to be held liable under the FSIA).

**4.2**    These actions were undertaken deliberately and recklessly, with knowledge that the material support provided to enemy forces responsible for the Terrorist Attacks would cause severe emotional distress to Plaintiffs.  More specifically, severe emotional distress to the KIA Family-Plaintiffs (who all lost a loved one as a result of the Terrorist Attacks), the Surviving-Plaintiffs who served in Iraq (who were all extremely fortunate to survive the Terrorist Attacks), and the remaining Surviving-Plaintiffs (who all suffered emotional trauma following their immediate-family member's experience during the Terrorist Attacks).

**4.3**    Defendant, by engaging in this intentional, unlawful conduct, intentionally inflicted emotional distress upon these Plaintiffs and may be held jointly and severally liable for Plaintiffs' damages under 28 U.S.C. § 1605A(c).  *See Flanagan,* 87 F. Supp. 3d at 116.

## B.    Assault and Battery

**4.4**    Courts in this district have applied assault and battery theories of liability to attacks like the one in this case. Iran is liable for assault if, "when it committed extrajudicial killing or provided material support and resources therefor, (1) it acted 'intending to cause a harmful contact with ... or an imminent apprehension of such a contact' by, those attacked and (2) those attacked were 'thereby put in such imminent apprehension.'" *Murphy v. Islamic Repub. of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010) (quoting Restatement (Second) of Torts § 21(1)).

**4.5**    Iran intended to cause harmful contact and apprehension of that contact because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Valore v. Islamic Repub. of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010). Accordingly, Iran caused Twenty-seven (27) Direct Injury Plaintiffs harm and caused them the fear they experienced during the attack and thereafter. Iran is liable for assault.

82

**4.6**    Iran is liable for battery if, "when it committed extrajudicial killing or provided material support and resources therefor, it acted 'intending to cause a harmful or offensive contact with ... or an imminent apprehension of such a contact' by those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly result[ed].'" *Murphy*, 740 F. Supp. 2d at 74 (quoting Restatement (Second) of Torts § 13). "Harmful contact is that which results in 'any physical impairment of the condition of another's body, or physical pain or illness.'" *Id.* (quoting Restatement (Second) of Torts § 15). Iran intended to cause harmful or offensive contact. And Twenty-seven (27) Direct Injury Plaintiffs experienced harmful contact during the attack. Thus, Iran is liable for battery.

## C.    Solatium

**4.7**    Moreover, because of Defendant's intentional, outrageous, and extreme conduct, the KIA Family-Plaintiffs and the Surviving-Plaintiffs have collectively suffered mental anguish, bereavement, grief, and loss of society and comfort. Accordingly, Defendants are liable for solatium damages suffered by these Plaintiffs. *See Murphy*, 740 F. Supp. 2d at 79 (noting that family members of both deceased and surviving servicemen qualify for solatium damages under the FSIA).

## D.    Punitive Damages

**4.8**    Following a 2008 amendment to the FSIA, 28 U.S.C. § 1605A(c) specifically authorizes a claim for punitive damages arising from state-sponsored acts of terrorism. In *Opati v. the Republic of Sudan,* the United States Supreme Court held the FSIA expressly authorized terrorist victims to recover punitive damages for past conduct. 140 S. Ct. 1601, 1608-09 (2020). In other words, the FSIA applies retroactively. *Id.*

4.9    The planning and execution of the Terrorist Attacks at issue in this lawsuit by various enemy forces in Iraq was malicious, willful, unlawful, reckless, and done so in wanton disregard for life and the standards of law that govern the actions of civilized nations.  And Iran's provision of material support and resources to these enemy forces is equally heinous.  *See, e.g.*, *Flanagan,* 87 F. Supp. 3d at 119 (concluding that Iran's support for Al-Qaeda, the terrorist organization responsible for the USS Cole attack, is equally as heinous as the attack itself). Additionally, by supporting these enemy forces, Iran clearly intended to further their own Anti-American agenda in Iraq and destabilize the region through terrorism.  *See generally supra* Section III(A).

4.10    In FSIA actions, this Court has also acknowledged the significant need to impose punitive damages to deter liable defendants from committing future acts of terrorism.  *See, e.g.*, *Flanagan,* 87 F. Supp. 3d at 119 ("Were this Court not to impose punitive damages for what was a spectacular terrorist act, this would be read by Iranian government officials as indicating a significant weakening of U.S. pressure on Iran to end its support for terrorism against Americans.").  Furthermore, Iran remains the most significant threat to active members of the U.S. armed forces operating in the Middle East.  *See supra* Section III(A-G) and accompanying sources (in September 2020, the Department of State concluded that "Iran's support for Shia militants in Iraq remains the primary threat to US personnel [in Iraq]" and that Iran "provides Lebanese Hizballah about $700 million each year").  Lastly, Iran's tremendous wealth supports an award for punitive damages. Specifically, the Heritage Foundation estimated Iran's 2023 GDP at *$1.6 trillion*.  *See* https://www.heritage.org/index/country/iran (last visited March 21, 2025).

84

**4.11**     For these reasons, Plaintiffs are entitled to recover punitive damages from Defendant Iran under 28 U.S.C. § 1605A(c).  *See Flanagan,* 87 F. Supp. 3d at 118-22.

## V.     <u>PRAYER FOR RELIEF</u>

**5.1**     **WHEREFORE**, Plaintiffs request that this Court grant judgment in their favor against Defendant Iran, and grant the following —

## A.     **The KIA Family-Plaintiffs**

**5.2**     The Five (5) KIA Family-Plaintiffs in this Complaint[114] seek these damages and other relief against Iran as a result of their tragic loss:

a.  Solatium damages for the mental anguish, bereavement, grief, and loss of society and comfort consistent with the framework for awarding such damages for family members of deceased terrorist victims in previous FSIA cases, including any upward departure the Court's deems appropriate for aggravating circumstances;[115]

b.  Punitive damages against Defendant in an amount consistent with the 3.44 to 1 ratio used by this Court in previous FSIA cases;[116]

c.  Pre-judgment Interest;[117]

d.  Punitive damages against Defendant in an amount consistent with the 3.44 to 1 ratio used by this Court in previous FSIA cases;[118]

e.  Post-judgment interest;

---

[114] *See supra* pp. 53-55 (detailed description of persons KIA in Iraq and resulting damages).

[115] *See Valore,* 700 F. Supp. 2d at 86; *Opati v. Republic of Sudan,* 60 F.  Supp. 3d 68, 79 (D.D.C. 2014) (noting that the standard solatium award for family members of deceased terrorism victims is $8 million to spouses, $5 million to parents and children, and $2.5 million to siblings); *see also Greenbaum v. Islamic republic of Iran,* 451 F. Supp. 2d 90, 108 (D.D.C. 2006) (departing upward from $8 million to $9 million in a widower's solatium award).

[116] *See, e.g., Murphy,* 740 F. Supp. 2d at 82 (holding that for every dollar of compensatory damages awarded, the appropriate amount to punish and deter Iran from supporting terrorism was $3.44).

[117] *See, e.g., Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya,* 811 F. Supp. 2d 53, 75-76 (D.D.C. 2011) (awarding pre-judgment interest against Syria from the date of attack until final judgment under the FSIA).

[118] *See Murphy,* 740 F. Supp. 2d at 82.

    **f.**   Reasonable cost and expenses;

    **g.**   Reasonable attorneys' fees; and

    **h.**   Such other and further relief that the Court may determine to be just and equitable under the circumstances.

## B.    The Surviving-Plaintiffs

**5.3**    The remaining Plaintiffs seek the following damages and other relief against Iran:

    **a.**   For the twenty-seven (27) Plaintiffs injured in Iraq as a direct result of the Terrorist Attacks:  Loss of earning capacity in the past and future;[119]

    **b.**   For the twenty-seven (27) Plaintiffs injured in Iraq as a direct result of the Terrorist Attacks:  Damages for pain and suffering consistent with the framework for assessing such damages developed by this Court in previous FSIA cases, including any upward departures the Court deems appropriate;[120]

    **c.**   For the forty-six (46) Plaintiffs who are immediate family members of former Armed Forces members and contractors injured in Iraq:  Solatium damages for the mental anguish, bereavement, grief, and loss of society and comfort consistent with the framework for awarding such damages for family members of surviving terrorist victims in previous FSIA cases, including any upward departure the Court's deems appropriate for aggravating circumstances;[121]

    **d.**   Pre-judgment interest;[122]

---

[119] *See supra* pp. 55-81 (detailed descriptions of former U.S. Armed Forces injured in Iraq and resulting damages).

[120] *See id; Opati,* 60 F. Supp. 3d at 77 ("courts in this district have developed a general framework for assessing pain-and-suffering damages for victims of terrorist attacks…"); *see also Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007) (departing upward from a $ 5 million baseline in more severe instances of physical and psychological pain).

[121] *See supra* pp. 55-81 (detailed descriptions of immediate family members of former U.S. Armed Forces members injured in Iraq and their resulting damages); *see also Opati,* 60 F.Supp.3d at 79*; Murphy,* 740 F. Supp. 2d at 79 (noting that the standard solatium award for family members of injured terrorism victims is $4 million to spouses, $2.5 million to parents, $2.5 million to children, and $1.25 million to siblings).

[122] *See supra* note 118.

**e.** Punitive damages against Defendant in an amount consistent with the 3.44 to 1 ratio used by this Court in previous FSIA cases;[123]

**f.** Post-judgment interest;

**g.** Reasonable cost and expenses;

**h.** Reasonable attorneys' fees; and

**i.** Such other and further relief that the Court may determine to be just and equitable under the circumstances.

Dated:  April 2, 2025                    Respectfully submitted,

/s/ *Matthew D. McGill*
Matthew D. McGill (D.C. Bar No. 481430)
GIBSON, DUNN & CRUTCHER LLP
1700 M. Street, N.W.
Washington, D.C. 20036
Telephone:  (202) 955-8500
Facsimile: (202) 530-9522
mmcgill@gibsondunn.com

/s/ *Craig W. Carlson*
Craig W. Carlson (D.C. Bar No. TX0182)
THE CARLSON LAW FIRM, P.C.
100 East Central Expressway
Killeen, TX 76541
Telephone: (254) 526-5688
Facsimile: (254) 526-8204
ccarlson@carlsonattorneys.com

/s/        *Jeremy C. Shafer*
Jeremy C. Shafer (DC Bar No. 1006578)
VETERAN LEGAL GROUP
700 12th Street NW, Suite 700
Washington, D.C.  20005
Telephone: (888) 215-7834
jshafer@bannerlegal.com

*Attorneys for Plaintiffs*

---

[123] *See Murphy*, 740 F. Supp. 2d at 82.

**87**